[No. C052801. Third Dist. Dec. 31, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
DWAYNE MICHAEL CURRY et al., Defendants and Appellants.

**COUNSEL**

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Titenesha Russell.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant Terry Buford.

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant Dwayne Curry.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Daniel B. Bernstein, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**CANTIL-SAKAUYE, J.**—The four defendants, Tashara Boone, Terry Buford, Dwayne Michael Curry and Titenesha Lanae Russell beat, robbed

and kidnapped Buford's ex-girlfriend L.R. who was seven months pregnant with Buford's child. They were charged with six felonies: count one—attempted premeditated murder of "Baby Doe," a seven-month-old fetus (Pen. Code, §§ 664, 187)[1] with the special allegation that Boone, Curry and Russell personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)); count two—assault with a deadly weapon by means of force likely to cause great bodily injury (§ 245, subd. (a)(1)) with the special allegation that Boone, Curry and Russell inflicted the injuries when they knew or should have known that the victim was pregnant and that the injuries terminated the pregnancy (§ 12022.9, subd. (a)); count three—second degree robbery (§ 211); count four—kidnapping to commit robbery or "aggravated kidnapping" (§ 209, subd. (b)(1)); count five—attempted robbery (§§ 664, 211); and count six—conspiracy to murder a human fetus (§§ 182, subd. (a)(1), 187, subd. (a)). Boone pled guilty to counts one, two and three in exchange for a prison term of 14 years. The remaining defendants went to trial.

The jury convicted the three defendants on all counts, except it found Russell not guilty of robbery and Curry not guilty of conspiracy. It found true all the special allegations except the allegation that Curry acted with premeditation in attempting to murder the fetus.

The court sentenced defendants as follows: Buford, to life in prison for aggravated kidnapping, a consecutive term of 25 years to life for conspiracy to commit murder, and a consecutive upper term of five years for robbery. The court stayed sentences on the remaining counts pursuant to section 654; Curry, to life in prison for aggravated kidnapping plus a determinate term of 11 years eight months: the upper term of nine years for attempted murder, one year for the weapon use enhancement, one year for robbery and eight months for attempted robbery. The court stayed sentences on the remaining counts pursuant to section 654; Russell, to life in prison for aggravated kidnapping and a consecutive term of 25 years to life for conspiracy to commit murder. It stayed sentence on the remaining counts pursuant to section 654.

The three defendants appeal, challenging the sufficiency of the evidence, jury instructions and the upper term sentences. We shall affirm the judgment.

## FACTUAL BACKGROUND

A. *The Prosecution's Case*

L.R. dated Buford before she became pregnant with his child in February 2004. As the pregnancy progressed, Buford told L.R. she should have an

---

[1] Hereafter, undesignated statutory references are to the Penal Code.

abortion. L.R. wanted to have the baby and told Buford that he could "just pay child support" if he "didn't want to be there." Buford acted indifferently and began to deny that the child was his. When L.R. was about five months pregnant, L.R. and Buford broke off their relationship.

At some time in the weeks leading up to the assault, L.R. called Buford's cell phone. A woman answered and identified herself as Buford's sister. The same woman, whose voice L.R. identified as Russell's, called L.R. to ask about the baby and the identity of the father. She continued to make harassing phone calls to L.R., calling her a "bitch" and threatening to kill L.R. and her baby.

Before the assault, L.R. told Buford that she had $700 and was willing to lend him money to repair his car. She lived with her grandmother and kept the money there.

Boone testified pursuant to her agreement to cooperate with the district attorney's office. She and Buford were "best friends." On September 20, 2004, five days before the assault and kidnapping, Buford asked Boone to "beat somebody up." She agreed to help him. In subsequent conversations, Boone learned that Buford and L.R. had argued over whether he was the baby's father.

Between September 20 and September 25, Buford and Boone devised a plan. Buford would invite L.R. to the movies but take her to a park where Boone would beat her up. The goal was to force L.R. to have a miscarriage. Boone asked Russell to help beat up L.R. and she agreed.

About 8:00 p.m. on September 25, 2004, Buford picked up L.R. at her home for the ostensible purpose of taking her to the movies. He was driving a white Chevrolet Malibu. Curry, whom L.R. knew through Buford as "Pacman," was sitting in the backseat. Buford picked up Russell, who joined Curry in the backseat, then drove to a liquor store. After Buford, Curry and Russell bought liquor, everyone changed seats. Russell drove with Curry beside her. Buford and L.R. were in the backseat. Instead of going to the movies, defendants drove L.R. to a park in Elk Grove.

Buford and Russell informed Boone of their whereabouts by cell phone, while she waited for their arrival at the park. Buford, Curry and Russell drank behind some bushes and L.R. sat by herself. Eventually, L.R. told Buford she wanted to go home and he agreed to drive her back. Buford had his arm around L.R.'s waist, but turned sideways as they walked.

When Buford gave the signal, Boone and Russell ran in front of him and L.R., turned, and Boone sprayed L.R. in the face with Mace. Boone also

hit L.R. in the face. L.R. tried to fight back but was blinded by the Mace. Russell joined the fray and punched L.R. in the face. L.R. fell to the ground. L.R. told her attackers that she was pregnant. When L.R. asked Buford for help, he responded, "[J]ust fight back."

The attack continued while L.R. was on the ground. Curry kicked her in the side. He also threw a garbage can at L.R., hitting her in the head. Boone removed L.R.'s tennis shoes and someone took her cell phone. At that point, Boone and Russell left in the Malibu by themselves. They drove north on Interstate 5 toward Meadowview where Russell's grandmother lived.

Back at the park, L.R. asked Buford to call an ambulance and he said, "Okay." However, instead of calling the ambulance, Buford called Boone and told her to "come back and finish the job." Boone asked Buford if he was trying to kill L.R., and Buford said, "[N]o, just the baby." He wanted Boone to continue, "as long as that baby gets up out of her." While Russell and Boone were driving back to the park, Buford called again to tell them to bring a baseball bat and flashlight from the car.

Boone and Russell approached L.R. at the park carrying a flashlight and baseball bat. Boone struck L.R.'s leg with the bat and Russell hit her in the head with the flashlight. The women told L.R. that Buford was not the father of her baby and he was not going to pay child support. L.R. named someone else as the baby's father because she wanted the beating to stop.

Boone testified that while Russell and L.R. continued to fight, Curry hit L.R. in the head, knocking her to the ground. Boone also stated that Curry kicked L.R. with both feet as she lay on the ground saying, "Help me, my baby." L.R. lost consciousness while she was on the ground.

Boone and Curry began searching L.R.'s clothing for money. Boone took $20 that they found inside L.R.'s bra. Changing her earlier testimony that she first learned of L.R.'s $700 in the car after they all left the park, Boone stated on redirect examination that Buford and Curry were looking for the $700 when Curry pulled L.R.'s clothes off. Curry removed L.R.'s pants and someone removed her socks. Defendants carried L.R. to the Malibu.

Once inside the car, Buford showed Boone and Russell a picture of the $700 on his cell phone, an image he had received from L.R. Although L.R. was not fully conscious, Buford suggested that they get the money from L.R.'s house by having her call her brother and asking him to bring it to the car.

Curry drove to Russell's apartment to get clean pants and underwear for L.R. Russell's roommate brought the clothes to the car and Boone and Russell put them on L.R. in the backseat of the car. Russell put a BB gun on her lap to scare L.R.

Curry continued to drive. Russell, Boone and Curry bought and smoked marijuana with the $20 they had taken from L.R. When someone looked in the car, Russell stated, "See what we do? See how we beat up bitches?" They let L.R. out of the car to urinate near a tree, but Boone and Russell stood next to her.

Once L.R. was awake, defendants turned their attention to the money. Boone and Russell told L.R. that she "better find some way" to retrieve the $700. Someone handed L.R. a cell phone and ordered her to call home. L.R. telephoned her grandmother and told her to send L.R.'s brother outside with her purse.

L.R.'s grandmother stepped outside of the house at 1:00 a.m. and saw the Malibu approaching. Curry sped away and L.R. called her grandmother again, telling her to send L.R.'s brother to the car with the money. Sensing trouble, L.R.'s grandmother asked if she was being held against her will. L.R. said that she was.

Curry pulled up again and L.R.'s brother approached the car. When he saw that L.R.'s face was bruised and bleeding, he told the occupants of the car to let her out. Instead, Curry drove off with L.R.'s brother holding onto the car door. L.R.'s grandmother called 911 when L.R.'s brother came inside.

L.R. asked to be taken to a hospital, but Curry refused. After discussing alternatives, defendants left L.R. by the side of the road. Curry drove to Russell's apartment where he, Russell and Boone spent the night.

L.R. walked to a nearby apartment where a resident found her and called 911. L.R. had bruises on her face and stomach and was fading in and out of consciousness. An ambulance transported her to the hospital.

Doctors treated L.R. for a fractured eye socket and extensive bleeding inside the eye. She was still experiencing double vision at the time of trial. The doctors drained blood from both of L.R.'s swollen ears. They noticed abrasions on L.R.'s face, abdomen and buttocks, and bruises all over her body.

Fetal heart monitors indicated that L.R.'s unborn baby was in distress and not receiving enough oxygen. L.R. was nearly 32 weeks pregnant at the time

of the assault and had not experienced any problems with her pregnancy. Doctors delivered the baby by emergency Cesarean section. The baby had an initial Apgar score of 1 on a scale of 1 to 10. A normal baby has an initial Apgar score of 7 or 8. Doctors placed the baby on a mechanical ventilator for 48 hours and supplied oxygen through its nasal passages for another five days. The baby remained in the hospital for three weeks.

## B. *Buford's Defense*

Buford's aunt, Crystal Latimore, testified that she met Boone in county jail in the fall of 2005. Boone approached her and began talking about the case. According to Latimore, Buford picked up Boone on his way to the movies because she asked for a ride. The aunt also testified that Boone said that the fight with L.R. was just between the two of them.

## C. *Curry's Defense*

Curry testified that he called Buford on the day of the assault to ask him for a ride to a motel where he was scheduled to babysit. When Buford arrived, he told Curry that he had to "handle some business" before driving him to the motel. Buford picked up L.R. in Del Paso Heights, picked up Russell in another part of town, then drove to Elk Grove.

According to Curry's testimony he did not learn about the plan to beat up L.R. until they met Boone at the park. Curry watched Boone and Russell assault L.R., but did not take part. He also claimed that he did not know that L.R. was pregnant until she fell to the ground and her peacoat came open.

Curry also testified about what happened when Boone and Russell returned to the park. He confirmed earlier testimony that Boone hit L.R. with the baseball bat and Russell hit her with the flashlight. Curry denied that he kicked or hit L.R., or threw a garbage can at her. Buford's sister testified later at trial that Buford, not Curry, kicked L.R. in the stomach while she lay on the ground in the park.

With respect to L.R.'s $700, Curry recounted that Russell pointed a gun at L.R. in the car and threatened to shoot her if she did not get the money. Curry said that he did not know what Russell was talking about and had not been privy to any discussions regarding the $700. He denied seeing the cell phone photo of the money. However, on cross-examination, Curry stated that while L.R. was lying on the ground in the park after the beating, he heard Buford tell the group to "check her for money."

Curry testified that he drove the car to Russell's apartment and L.R.'s grandmother's at the direction of Boone and Russell because he was afraid of them. He thought Russell's gun was real.

In response to a question from Russell's trial counsel, Curry testified that he was drunk at the park after consuming one and a half bottles of Mad Dog. On cross-examination, Curry stated that he knew what was happening and was able to drive the car. He acknowledged that he told the district attorney's investigator that he was "a little screwed up" from the alcohol, but "not too bad."

### D. *Russell's Defense*

Russell testified that she spoke to L.R. one time before the assault. She was on the speakerphone during a conversation between Boone and L.R. Boone and L.R. were arguing over Buford and L.R. challenged Boone to a fight.

On the night of the assault, Russell drove the Malibu with Buford, Curry and L.R. in the car. She stopped at a liquor store and bought three bottles of Mad Dog 20/20. Buford bought a Sprite. Russell and Boone shared one bottle; Curry drank the second bottle; and all three of them shared the third bottle. Russell testified that she took ecstasy that night. She also felt "out of character" because she does not drink.

Russell testified that she did not know that Boone was going to fight L.R. until they arrived at the park and Boone said, "I'm gonna fuck this bitch up." Russell offered to assist if she needed help. She admitted socking L.R. in the face after L.R. bumped into her in what she described as a "cat fight." Like Curry, Russell claimed that she did not realize L.R. was pregnant until L.R. fell to the ground. She testified that L.R. wore a peacoat that concealed her stomach.

Russell recounted that Buford had called Boone after they left the park the first time and told them to return to "finish the job." According to Russell, it was the first time she realized that Buford wanted to force L.R. to have a miscarriage. Russell testified that at that point, she still felt the effects of the alcohol and ecstasy, but "[n]ot . . . to the point where [she] didn't know what [she] was doing."

Russell testified that she retrieved the baseball bat and flashlight from the backseat of the Malibu, but denied hitting L.R. with the flashlight. Russell and Boone put L.R. in the backseat of the Malibu while she was unconscious.

After everyone was in the car, Buford said L.R. had money and showed them the photo on his cell phone. Russell told L.R. that she wanted the

money and L.R. agreed to get it. Russell assumed she agreed because she did not want to suffer another beating. Russell acknowledged that there was a BB gun in the car, but claimed she never threatened L.R. with it. Russell stated that the sole purpose of placing L.R. in the car was to take her home and that she never intended to force L.R. to stay in the car to rob her. According to Russell, no one told Curry where to take L.R. after they drove away from L.R.'s house the second time. Later that night, Curry bragged that he rendered L.R. unconscious and complained that he got her blood on his shoes.

## DISCUSSION

### I.

### *There Was Sufficient Evidence of Defendants' Intent to Rob*

Defendants argue that there is insufficient evidence to prove them guilty of aggravated kidnapping in count four. They maintain there is no evidence to show that they acted with the specific intent to rob L.R. at the time they moved her from the park to the car. The record does not support defendants' argument.

When a defendant challenges the sufficiency of the evidence, the reviewing court "must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781], italics in original.) '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)" (*People v. Davis* (1995) 10 Cal.4th 463, 509 [41 Cal.Rptr.2d 826, 896 P.2d 119] (*Davis*).) "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]" (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126 [121 Cal.Rptr.2d 909].) Indeed, we " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.]" (*Davis, supra,* at p. 509.)

A person is guilty of kidnapping under California law if he or she "forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another

country, state, or county, or into another part of the same county . . . ." (§ 207, subd. (a).) The Legislature dictates greater punishment for aggravated kidnapping under section 209, subdivision (b)(1) where the accused "kidnaps or carries away any individual to commit robbery . . . ." Section 209 also requires asportation or "movement of the victim that is not merely incidental to the commission of the robbery, and which substantially increases the risk of harm over and above that necessarily present in the crime of robbery itself. [Citations.]" (*People v. Rayford* (1994) 9 Cal.4th 1, 12 [36 Cal.Rptr.2d 317, 884 P.2d 1369] (*Rayford*); see § 209, subd. (b)(2).)

The parties agree that for them to be found guilty of aggravated kidnapping, the evidence must show that they intended to commit the robbery at the time they held or detained L.R. "A person [cannot] kidnap and carry away his victim to commit robbery if the intent to rob [is] not formed until after the kidnap[p]ing ha[s] occurred." (*People v. Tribble* (1971) 4 Cal.3d 826, 831 [94 Cal.Rptr. 613, 484 P.2d 589].) Thus, the crime of aggravated kidnapping " 'is similar to burglary where it is necessary to show that the entry was with the intent to commit larceny or any felony. An illegal entry but without such an intent is not a burglary [citation]; similarly . . . , kidnapping without intent to rob constitutes kidnapping but not kidnapping for purpose of robbery; and a robbery during a kidnapping where the intent was formed after the asportation is a robbery and not a kidnapping for purpose of robbery.' [Citations.]" (*Ibid.*) Moreover, the robbery need not be completed. "All that is required is that the defendant have the specific intent to commit a robbery at the time the kidnapping begins." (*People v. Davis* (2005) 36 Cal.4th 510, 565–566 [31 Cal.Rptr.3d 96, 115 P.3d 417].)

Defendants claim they did not have the specific intent to rob L.R. at the time they put her in the Malibu. They cite evidence to show that they decided to rob L.R. only after they drove away with L.R. and Buford showed them the photo of the $700 on his cell phone. All three maintain that there is no evidence they knew about the money before they placed L.R. in the car. Defendants ignore the inferences to be drawn from other evidence presented at trial.

Boone testified on redirect examination that Buford and Curry were looking for the $700 when Curry pulled L.R.'s clothes off at the park. Both Russell and Curry told the district attorney's investigator that they heard Buford tell the others to "check for money" while L.R. lay on the ground after the second assault. Buford told them that L.R. "had money someplace, she had just gotten paid or something." Russell also told the district attorney's investigator that she heard Buford ask L.R. where the money was several times. According to Russell's statement to the district attorney's investigator, thereafter, Curry ripped off L.R.'s clothes and found the $20.

And in the car Buford said to L.R., "I thought you had $700." We conclude that the jurors could reasonably infer from this circumstantial evidence that defendants knew about L.R.'s $700 before they put her in the car and formed the required specific intent to rob her at that time. (*In re Michael D., supra,* 100 Cal.App.4th at p. 126.)

Buford contends that "any inference that [he] intended to rob [L.R.] of the money at the time of the movement is made unreasonable by [L.R.'s] own testimony that it was her intent to lend [Buford] the $700, that she had informed him of that fact and that she had never verbally reneged." She did, in fact, testify on that point at trial. However, we reject Buford's contention. The evidence was that Buford lured L.R. to the park where he set her up so she could be ambushed and brutally assaulted by his friends. And, although L.R. testified that she had previously offered to loan Buford the $700 to repair his car, a jury could reasonably infer that, under the circumstances, L.R. was no longer willing to loan him money.

■ Buford also maintains that the prosecution failed to establish the asportation element of the crime. He argues that the movement of L.R. from the park to the house was merely incidental to the robbery and did not substantially increase the risk of harm to her. Whether the forced movement of the victim was merely incidental to the target crime, and whether that movement substantially increased the risk of harm to the victim, "is difficult to capture in a simple verbal formulation that would apply to all cases." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1151 [47 Cal.Rptr.3d 575, 140 P.3d 866].) The Supreme Court suggests that the asportation element requires "a multifaceted, qualitative evaluation rather than a simple quantitative assessment. Moreover, whether the victim's forced movement was merely incidental to the [target crime] is necessarily connected to whether it substantially increased the risk to the victim. 'These two aspects are not mutually exclusive, but interrelated.' (*Rayford,* [*supra,* 9 Cal.4th] at p. 12.)" (*Id.* at p. 1152.)

In support of his argument, Buford contends that the only way for defendants to get the $700 was to return to L.R's house, thus "the movement from the park to the house was 'merely incidental to the target crime' and did not substantially increase the risk of harm to [L.R.]" He suggests that they moved her from a location "where the likelihood of detection was near zero, to others, where it was more likely that she be observed and aided." Buford's analysis ignores the evidence and minimizes the interrelationship between the movement and the increased risk in the circumstances of this case. We disagree that the movement of L.R. from the park to the house was incidental to the target crime of robbery. Defendants drove to several locations before they went to L.R.'s home. Once inside the Malibu, defendants drove to obtain

clean clothing for L.R., bought and smoked marijuana and Curry sped off not once but twice from L.R.'s home. And, even if detection was arguably more likely after defendants left the park with L.R., she was clearly not any safer. Defendants had placed L.R. in the backseat of the Malibu between Boone and Russell, with a self-proclaimed "drunk" driver, Curry, at the wheel. The pregnant L.R. was bruised, bleeding and unconscious when defendants placed her in the Malibu. Curry testified that in the car, Russell pointed a gun at L.R. and threatened to shoot her if she did not get the money. Further, the inference could be made that any delay in getting L.R. medical care substantially increased the risk of harm to her and her unborn child. On this record, a jury could reasonably find that defendants' forced movement of L.R. was more than incidental to the robbery and substantially increased her risk of harm.

## II.

### *There Is No Error in the Jury Instruction on Kidnapping for Robbery*

██ Russell contends that Judicial Council of California Criminal Jury Instructions (2006) CALCRIM No. 1203 (Kidnap for Robbery) improperly allowed the jury to convict her of aggravated kidnapping without finding that she had the intent to rob L.R. at the time the kidnapping commenced. We conclude that CALCRIM No. 1203 is a correct statement of the law.

The court instructed the jury on the elements of aggravated kidnapping as follows:

"[T]he defendants are charged in Count Four with kidnapping for the purpose of robbery. To prove that a defendant is guilty of this crime, the people must prove that, *one, the defendant intended to commit robbery; two, acting with that intent, the defendant took, held or detained another person by force or instilling a reasonable fear; and, three, using that force or fear, the defendant moved the other person or made the other person move a substantial distance*; and, four, the other person was moved or made to move a distance beyond that merely incidental to the commission of the robbery; and, five, the other person did not consent to the movement; and, six, the defendant did not actually and reasonably believe, that the other person consented to the movement.

"In order to consent, a person must act freely and voluntarily and know the nature of the act. As used here, a substantial distance means more than a slight or trivial distance. The movement must have substantially increased the risk of harm to the person beyond that necessarily present in the robbery.

In deciding whether the movement was sufficient, consider all of the circumstances relating to the movement." (Italics added.)

Although CALCRIM No. 1203 does not expressly state that the intent to rob must exist at the time the movement commences, we conclude that the first three points of the instruction, set forth in italics, adequately express that requirement. The instruction describes the sequence of events starting with intent and followed by action—first to take, hold or detain the victim by force or fear, and then to move the victim a substantial distance. There was no error.

## III.

### *Failure to Give the Unanimity Instruction Was Harmless*

Buford argues that the court prejudicially erred in failing to instruct the jury on the requirement of unanimity with regard to the robbery charge in count three.[2] He notes that there was evidence of three acts of robbery—the forcible taking of L.R.'s shoes, cell phone and $20—and argues that jurors could have disagreed about which act or acts Buford committed. The Attorney General argues that there was evidence of only two acts of robbery, one act being the taking of L.R.'s shoes and cell phone and the other act being the later taking of L.R.'s $20. The Attorney General has the better argument.

■ The record reflects three items were taken from L.R. The taking of two items, L.R.'s shoes and phone, occurred almost simultaneously during the first assault at the park and there is no evidence suggesting otherwise. On these facts, the taking of L.R.'s shoes and cell phone were so closely connected that they formed a single incident of robbery and no unanimity instruction was required to distinguish between those takings. (*People v. Thompson* (1995) 36 Cal.App.4th 843, 851 [42 Cal.Rptr.2d 798] ["A unanimity instruction is not required where the offenses are so closely connected to form a single transaction or where the offense itself consists of a continuous course of conduct"].)

The third item taken from L.R. was her $20. Prior to the taking of her $20, Boone and Russell had ended the first assault and had driven away from the

[2] CALCRIM No. 3500 states: "The defendant is charged with _____ [in Count ____] [sometime during the period of _____ to _____ ]. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed." The court instructed the jury with CALCRIM No. 3500 in connection with the personal weapon use allegation.

park. L.R. asked Buford to call an ambulance; instead however, Buford called Boone and Russell back to the park to assault L.R. further. While Boone and Russell were driving back to the park, Buford called again to tell them to bring a bat and flashlight from the car. Defendants took the $20 during the second assault, when Boone and Russell returned to the park to "finish the job." It appears from the record that the first robbery at the park was separated from the second robbery by a period of time, during which the beating of L.R. had abated and Buford was able to make two phone calls, the first to summon Boone and Russell back to the park to finish the job and the second to *ask them to* bring a bat and a flashlight. Thus, the record demonstrates that L.R. was robbed at the park two separate times.

"[W]hen the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 [108 Cal.Rptr.2d 436, 25 P.3d 641].) Where no election is made, the court has a duty to instruct sua sponte on the unanimity requirement. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534 [70 Cal.Rptr.2d 878].)

█ The failure to provide a unanimity instruction is subject to the *Chapman* harmless error analysis on appeal.[3] (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 186 [7 Cal.Rptr.3d 483] (*Wolfe*), citing *People v. Deletto* (1983) 147 Cal.App.3d 458, 472 [195 Cal.Rptr. 233].) Under that standard the question is " 'whether it can be determined, beyond a reasonable doubt, that the jury actually rested its verdict on *evidence* establishing the requisite [elements of the crime] independently of the force of the . . . misinstruction.' " (*Wolfe, supra*, 114 Cal.App.4th at p. 188.)

We conclude that the error in failing to instruct the jury on unanimity was harmless beyond a reasonable doubt. "Where the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless. (*People v. Deletto, supra*, 147 Cal.App.3d at p. 473.) Where the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless. [Citation.]" (*People v. Thompson, supra*, 36 Cal.App.4th at p. 853.)

In this case, the prosecutor argued that Buford was an aider and abettor in the taking of L.R.'s shoes, cell phone and money at the park. Buford

---

[3] *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*).

maintained that there was no evidence that he took *anything* from L.R. although he was there. He suggested that the only evidence that he aided and abetted the crime came from Curry, whose testimony the jury should not believe. Buford also argued that he had no motive to rob L.R. because she had agreed to give him the $700. Defense counsel argued that his client did nothing in regard to the money and suggested that, "it was . . . the women in the back seat that were interested in that money and were making the claims and making the requests . . . ." The verdicts demonstrate that the jury rejected Buford's defense.

The evidence is overwhelming that Buford masterminded all of the crimes against L.R., including the robberies. It also shows that he was an aider and abettor in all of the crimes including the two separate robberies at the park. Circumstantial evidence suggests that Buford encouraged Curry to take the cell phone during the first assault to prevent L.R. from calling for help. Evidence that the cell phone ended up in the hands of Buford's cousin supports the inference that even if Curry took the cell phone in the first instance, Curry gave the cell phone to Buford. Evidence of Buford's role as an aider and abettor is even stronger as to the $20 taken from L.R. in the second assault, where he repeatedly asked L.R. for the money and told Curry to "check [L.R.] for money." Buford, however, did not argue or present any evidence from which the jury could distinguish between the acts of robbery at the park; he offered the same defense to both acts of robbery—that he took nothing from L.R. and had no motive to do so—yet the evidence of his involvement in the second act of robbery was conclusive. Given this record, it is reasonable to conclude that the jury believed beyond a reasonable doubt that Buford committed all acts if he committed any. Thus, the failure to give the unanimity instruction was harmless beyond a reasonable doubt. (See *Wolfe*, *supra*, 114 Cal.App.4th at p. 188; *People v. Gary* (1987) 189 Cal.App.3d 1212, 1218–1219 [235 Cal.Rptr. 30].)

## IV.

### *The Jury Instructions on Voluntary Intoxication*

As to the attempted murder of L.R.'s unborn child, the prosecutor offered three theories of defendants' criminal liability: (1) liability as perpetrators; (2) liability as aiders and abettors of attempted murder; and (3) liability as aiders and abettors of felony assault on L.R., the natural and probable consequence of which was attempted murder. The court instructed the jury on these theories pursuant to CALCRIM Nos. 400 (Aiding and Abetting: General Principles), 401 (Aiding and Abetting: Intended Crimes) and 402 (Natural and Probable Consequences Doctrine). Because trial testimony showed that some if not all defendants were intoxicated when they assaulted L.R. at

the park, the court also read the jury several instructions that addressed voluntary intoxication, including CALCRIM No. 404 (Intoxication), which stated:

"If you conclude that a defendant was intoxicated at the time of the alleged crime, you may consider this evidence in deciding whether the defendant, A, knew a perpetrator intended to commit the felony assault, and, B, intended to aid and abet the felony assault.

"Someone is intoxicated if he or she used any drug, drink or other substance that caused an intoxicating effect.

"Do not consider evidence of intoxication in deciding whether attempted murder is a natural and probable consequence of felony assault."[4]

All three defendants contend the court erred in instructing the jury on the effect of voluntary intoxication on the charges in this case. Curry and Russell argue that the court erred when it told the jury to disregard their voluntary intoxication when considering their liability for attempted murder as the natural and probable consequence of assault. Russell maintains that the error violated her constitutional rights to due process and equal protection. Taking a different tack, Buford contends the instructions read as a whole failed to advise the jury explicitly on the need to consider voluntary intoxication in assessing his liability as an aider and abettor for the specific intent crimes of

---

[4] The court gave other instructions on voluntary intoxication. On the special allegation of premeditation and deliberation attached to the attempted murder charge, the court instructed the jury pursuant to CALCRIM No. 625 that it could consider evidence of voluntary intoxication "in deciding whether a defendant acted with an intent to kill or the defendant acted with deliberation and premeditation."

It also instructed the jury more generally regarding voluntary intoxication pursuant to CALCRIM No. 3426: "You may consider evidence, if any, of the defendant's voluntary intoxication only in the limited way specified in the instructions. You may consider that evidence in deciding whether the defendant acted with the specific intent required for the crime.

"The people have the burden of proving beyond a reasonable doubt that the defendant acted with the specific intent required for Counts One, Three, Four, Five and Six and the special finding of premeditation and deliberation relating to Count One and termination of the pregnancy in Count Two.

"If the people have not met this burden, you must find the defendant not guilty of those crimes and the allegations not true.

"You must not consider evidence of voluntary intoxication for any other purpose. Voluntary intoxication is not a defense to Count Two, assault by means of force likely to produce great bodily injury or deadly weapon or the lesser crimes of assault, battery, false imprisonment or kidnapping.

"I read to you [that] you may not consider evidence of involuntary [sic] intoxication for any other purpose. I'm going to say that you may not consider evidence of voluntary intoxication for any purpose not specifically stated in these instructions."

attempted murder, robbery, attempted robbery and kidnapping for robbery. We conclude that the instructions on voluntary intoxication were correct statements of the law. And even if the instructions were flawed, the error was harmless in light of the record and verdicts returned by the jury.

## A. Claims Raised by Curry and Russell

Curry and Russell maintain that the last sentence in CALCRIM No. 404 is misleading regarding the effect of intoxication on their understanding of whether attempted murder was a reasonably foreseeable consequence of the group's joint assault on L.R. Specifically, with respect to the equal protection claim, Russell contends that "an aider and abettor who is alleged to know the perpetrator's intent to kill at the beginning of an offense can use the intoxication defense, but an aider and abettor [like Russell] who does not know that the perpetrator intends to kill cannot use the same [defense]." Russell argued at oral argument that it was unfair that the intoxication defense was unavailable to her, the defendant alleged to be the most "far removed" from the assault in terms of knowledge and participation. Curry and Buford join in Russell's equal protection claim.

## 1. Russell's Knowledge of and Participation in the Felony Assault

Notwithstanding Russell's testimony that it was when Buford called Boone and her in the car that she first realized that Buford wanted to force L.R. to have a miscarriage, Russell attempts to minimize her knowledge of and participation in the assault. Nevertheless, Russell's argument that as the defendant alleged to be the most "far removed" from the assault in terms of knowledge and participation it is unfair that the intoxication defense was unavailable to her is both misplaced and inaccurate. Russell does not cite, and we do not know of, a case that measures the degree of the knowledge and intent of the aider and abettor. It is only necessary that the prosecution prove an aider and abettor had knowledge of her confederates' criminal purpose and the intent to encourage or facilitate that purpose. Once the jury makes these findings, it can convict a defendant of the intended crime and any other crime committed that was a natural and probable consequence of the intended crime. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123 [77 Cal.Rptr.2d 428, 959 P.2d 735] (*Mendoza*).) "Once the necessary mental state is established, the aider and abettor is guilty not only of the intended, or target, offense, but also of any other crime the direct perpetrator actually commits that is a natural and probable consequence of the target offense." (*Ibid.*, citing *People v.*

*Prettyman* (1996) 14 Cal.4th 248, 260–262 [58 Cal.Rptr.2d 827, 926 P.2d 1013] (*Prettyman*).) It follows then that the jury need not measure the degree of a defendant's knowledge or intent.

As to Russell's argument that the intoxication defense was unavailable to her, she is only partly accurate. It was unavailable only as to whether attempted murder was a natural and probable consequence of felony assault. Otherwise, the jury received, was instructed on, and rejected the evidence of intoxication on the aider and abettor theory of liability.

### 2. *CALCRIM No. 404 and the Mendoza Case*

■ As to CALCRIM No. 404, its last sentence, "Do not consider evidence of intoxication in deciding whether attempted murder is a natural and probable consequence of felony assault" is based on language contained in *Mendoza, supra*, 18 Cal.4th at page 1133. In that case, the Supreme Court described the mental state required to establish aider and abettor liability and clarified the impact of voluntary intoxication on that determination. The *Mendoza* case began by explaining: " 'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.' (§ 31.) Accordingly, an aider and abettor 'shares the guilt of the actual perpetrator.' [Citation.] The mental state necessary for conviction as an aider and abettor, however, is different from the mental state necessary for conviction as the actual perpetrator. [¶] The actual perpetrator must have whatever mental state is required for each crime charged . . . . An aider and abettor, on the other hand, must 'act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.] The jury must find 'the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense . . . .' [Citations.] Once the necessary mental state is established, the aider and abettor is guilty not only of the intended, or target, offense, but also of any other crime the direct perpetrator actually commits that is a natural and probable consequence of the target offense. [Citation.]" (*Id.* at pp. 1122–1123.)

■ The Supreme Court then turned to the question "whether evidence of voluntary intoxication is admissible on the question whether a defendant tried

as an aider and abettor had the required knowledge and intent." (*Mendoza, supra*, 18 Cal.4th at p. 1123.) It reviewed the historical development of section 22[5] and held that a jury may consider evidence of a defendant's voluntary intoxication in deciding whether he or she had the knowledge and intent necessary for aiding and abetting commission of the target offense. (*Mendoza, supra*, at pp. 1118, 1131.) The *Mendoza* court also concluded that such evidence was admissible regardless of whether the target crime required general or specific intent. (*Id.* at p. 1132.) The Supreme Court emphasized that its holding was "very narrow" and explained, in language challenged by Curry and Russell, that: "Defendants may present evidence of intoxication solely on the question whether they are liable for criminal acts as aiders and abettors. *Once a jury finds a defendant did knowingly and intentionally aid and abet a criminal act, intoxication evidence is irrelevant to the extent of the criminal liability.* A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime but also of any other crime the perpetrator actually commits that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.] *Intoxication is irrelevant in deciding what is reasonably foreseeable.*" (*Id.* at p. 1133, some italics added.)

CALCRIM No. 404 is faithful to *Mendoza*. Regardless of Curry and Russell's view that *Mendoza* misstates the law, we are bound by that decision. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Moreover, in our view, *Mendoza* does not misstate the law.

### 3. *The Equal Protection Claim Fails*

■ Russell misreads *Mendoza* and its impact on the equal protection claim. "The constitutional guaranty of equal protection of the laws has been judicially defined to mean that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty and property and in their

---

[5] Section 22 currently reads: "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

"(b) *Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.*

"(c) Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance." (Italics added.)

pursuit of happiness. [Citations.] The concept recognizes that persons similarly situated with respect to the legitimate purpose of the law receive like treatment, but it does not, however, require absolute equality. [Citations.]" (*People v. Romo* (1975) 14 Cal.3d 189, 196 [121 Cal.Rptr. 111, 534 P.2d 1015].)

■ An aider and abettor charged with attempted murder who is aware of the perpetrator's intent to kill before the offense is not similarly situated to an aider and abettor charged with attempted murder as a reasonably foreseeable consequence of felony assault under a natural and probable consequence theory. While these two theories share a knowledge and intent requirement, the natural and probable consequence theory requires more. In the latter case, after the jury finds the required knowledge and intent, it must also determine, based on an *objective test*, whether the attempted murder is the natural and probable consequence of the felony assault. This determination is based on whether the charged offense is a reasonably foreseeable consequence of his confederates' action. (*Prettyman, supra,* 14 Cal.4th at pp. 260–261.) Thus, the determination does not implicate the aider and abettor's mental state.

*Mendoza* holds that evidence of voluntary intoxication is admissible on the question of knowledge and intent (*Mendoza, supra,* 18 Cal.4th at pp. 1118, 1131), which requires the jury to engage in a *subjective* analysis of whether intoxication affected the defendant's formation of the required mental state. The *Mendoza* court properly concluded that "[i]ntoxication is irrelevant in deciding what is reasonably foreseeable." (*Id.* at p. 1133.)

However, even if we were to conclude the jury should have been instructed to consider defendants' intoxication in deciding whether attempted murder was a natural and probable consequence of the assault, it is clear neither Curry nor Russell was prejudiced by any alleged instructional error.

In finding Russell guilty of attempted murder, the jury found true the allegation that she acted with premeditation and personally used a deadly and dangerous weapon. Similarly, the jury found Curry guilty of attempted murder and found true the allegation he personally used a deadly and dangerous weapon in the commission of that crime. The jury also found both Curry and Russell guilty of assault and found true the allegation that they personally inflicted great bodily injury upon L.R., when they knew or should have known L.R. was pregnant. These findings demonstrate that the jury (1) rejected defendants' voluntary intoxication claims and (2) found Curry and Russell guilty as perpetrators. Indeed, Russell acknowledged she felt the

effects of alcohol and ecstasy the night of the assault, but "[n]ot so much to the point where I didn't know what I was doing." Thus, any error in instructing the jury not to consider evidence of intoxication in deciding whether attempted murder is a natural and probable consequence of felony assault was harmless. The jury's findings also preclude any claim of prejudice from Russell's claim that CALCRIM No. 404 violated her constitutional rights.

B. *Claims Raised by Buford*

Buford makes the more general claim that the instructions on voluntary intoxication were incomplete. He contends that the instructions failed to guide the jury in its consideration of evidence of voluntary intoxication as it related to his liability for the specific intent crimes of attempted murder on a "non-natural and probable consequences theory," and robbery, attempted robbery and kidnapping for robbery on an aider and abettor theory of liability. We reject these contentions on two grounds.

First, we conclude that when read together (see *People v. Smithey* (1999) 20 Cal.4th 936, 963 [86 Cal.Rptr.2d 243, 978 P.2d 1171]), the instructions contained in CALCRIM Nos. 404 (Intoxication), 625 (Voluntary Intoxication: Effects on Homicide Crimes) and 3426 (Voluntary Intoxication) provided adequate guidance to the jury. CALCRIM No. 3426 specifically told the jurors that they could consider defendant's voluntary intoxication "in deciding whether the defendant acted with the specific intent . . . [¶] [r]equired for Counts One, Three, Four, Five and Six . . . ."

Second, Buford was not prejudiced by any error in instructing the jury on voluntary intoxication because there is no evidence he was intoxicated—or that he even drank alcohol—the night of the incident. Russell testified that she purchased three bottles of Mad Dog 20/20 at a liquor store in route to the park. Buford bought a Sprite. According to Russell, she and Boone shared one bottle, Curry drank a second, and all three of them shared the third bottle. This lack of evidence explains why Buford's attorney did not mention voluntary intoxication in his closing argument.

## V.

### *Jury Instructions on Premeditation*

As we explained, the prosecutor tried defendants for attempted premeditated murder of L.R.'s unborn child in count one on three theories: (1) as perpetrators; (2) as aiders and abettors of attempted murder; and (3) as aiders and abettors of felony assault on L.R., the natural and probable consequence

of which was attempted murder. The court instructed the jury on the special finding in count one: "The special finding of premeditation and deliberation may be found true where a principle [*sic*] attempted a willful, deliberate and premeditated murder even though the aider and abettor did not personally deliberate or premeditate. The aider and abettor must share the intent to kill." However, when instructing the jury attempted murder as a natural and probable consequence of felony assault, the court did not describe the offense as *premeditated* attempted murder.[6]

Russell argues that these instructions improperly "allowed [the] jurors to attach a premeditation finding to [her] attempted murder charge, even if they explicitly found she did not personally premeditate, exposing her to a sentence of life without parole . . . ." She also maintains that the instructional error violated her constitutional right to due process. We conclude the instructions were a correct statement of the law, and even if the instructions were improper, Russell suffered no prejudice.

█ Russell misreads the instruction on premeditation and deliberation. To find an aider and abettor criminally liable for premeditated attempted murder, the jury must find that the defendant "share[d] the intent to kill." A jury could not make a true finding on the special allegation on premeditation if it determined that Russell only intended to aid and abet a perpetrator in felony assault without harboring the intent to kill L.R.'s unborn child.

█ Moreover, *People v. Lee* (2003) 31 Cal.4th 613 [3 Cal.Rptr.3d 402, 74 P.3d 176] (*Lee*) holds that a person may be convicted of premeditated attempted murder as an aider and abettor even if he or she did not personally act with willfulness, deliberation and premeditation. (*Id.* at pp. 624, 627.) Russell acknowledges this proposition as far as it goes, but notes that the Supreme Court left open the question whether the same rule applies where

---

[6] The instructions read in their entirety:

"The defendant is charged in Count Two with assault with a deadly weapon or with force likely to produce great bodily injury, felony assault. In Count One, with attempted murder.

"You must first decide whether the defendant is guilty of felony assault. If you find the defendant is guilty of this crime, you must then decide whether he or she is guilty of attempted murder.

"Under certain circumstances, a person who is guilty of one crime may also be guilty of the other crimes that were committed at the same time.

"To prove that the defendant is guilty of attempted murder, the people must prove that, one, the defendant . . . is guilty of felony assault. Two, during the commission of the felony assault, the crime of attempted murder was committed, and, three, under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of attempted murder was a natural and probable consequence of the commission of the felony assault.

"A natural and probable consequence is one that a reasonable person would know was likely to happen if nothing unusual intervenes."

the defendant is found guilty of attempted murder on a theory of natural and probable consequences. We agree with the reasoning of *People v. Cummins* (2005) 127 Cal.App.4th 667, 680 [25 Cal.Rptr.3d 860] and *People v. Laster* (1997) 52 Cal.App.4th 1450, 1473 [61 Cal.Rptr.2d 680] that *Lee* should apply in a case involving the natural and probable consequences doctrine.

Russell also urges us not to apply *Lee* in the circumstances of this case because (1) a person who "only aids and abets a lesser offense than attempted murder is insufficiently blameworthy for the harsh life sentence that premeditated attempted murder carries"; (2) imposing a life sentence on a defendant who has not directly aided and abetted an attempted premeditated murder would violate the federal and state Constitutions; and (3) *Lee* undermines the subsequent Supreme Court ruling in *People v. Seel* (2004) 34 Cal.4th 535 [21 Cal.Rptr.3d 179, 100 P.3d 870], which holds that premeditation is an element of the offense of attempted murder. We need not address these arguments. Even if the court erred in instructing the jury on premeditation in the circumstances of this case, the error was harmless beyond a reasonable doubt.

The jury convicted Russell of conspiracy to commit murder in addition to premeditated attempted murder. In finding Russell guilty of conspiracy to commit murder, the jury necessarily found that she premeditated and deliberated the murder of L.R.'s unborn child. (See *People v. Cortez* (1998) 18 Cal.4th 1223, 1232 [77 Cal.Rptr.2d 733, 960 P.2d 537] ["The mental state required for conviction of conspiracy to commit murder necessarily establishes premeditation and deliberation of the target offense of murder" (italics omitted)].)

The record provides overwhelming support for the jury's findings. Russell drove L.R. to the park fully aware of the plans to beat her up in an attempt to cause a miscarriage. She punched L.R. in the face during the first assault. Although Russell and Boone left in the Malibu after L.R. had been beaten and robbed of her shoes and cell phone they returned to the park when Buford phoned and told them to return and "finish the job." Boone testified that she asked Buford if he was trying to kill L.R., and Buford said, "[N]o, just the baby." He wanted Boone to continue, "as long as that baby gets up out of her." This time the two women came armed with a baseball bat and flashlight which Russell used to strike L.R. on the head. The second assault left L.R. unconscious.

## VI.

### _Sentencing to the Upper Term Without a Jury Trial on the Aggravating Factors_

Citing _Cunningham v. California_ (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], _Blakely v. Washington_ (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] (_Blakely_), and _Apprendi v. New Jersey_ (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (_Blakely_), Buford and Curry argue that the court violated their Sixth Amendment rights by sentencing them to the upper term for their convictions for robbery (Buford) and assault with a deadly weapon and attempted murder (Curry) without permitting the jury to decide the aggravating factors beyond a reasonable doubt.[7] We agree, but conclude the error was harmless.

We begin by rejecting the Attorney General's argument that Buford and Curry forfeited their claim of _Apprendi/Blakely/Cunningham_ error by failing to object on federal constitutional grounds at sentencing. Any request for jury trial on the aggravating circumstances would have been futile, because the trial court would have been required to follow the California Supreme Court's decision in _People v. Black_ (2005) 35 Cal.4th 1238 [29 Cal.Rptr.3d 740, 113 P.3d 534] and deny the request. (_People v. Sandoval_ (2007) 41 Cal.4th 825, 837–838 [62 Cal.Rptr.3d 588, 161 P.3d 1146] (_Sandoval_).) Defendants' claim has not been forfeited. (_Ibid._)

Turning to the merits, we note that none of the aggravating circumstances cited by the trial court come within the exceptions to the requirement of jury determination set forth in _Apprendi_ and _Blakely_—specifically, facts admitted by the defendant (_Blakely, supra_, 542 U.S. at p. 303 [159 L.Ed.2d at p. 413]) or the fact of prior convictions (_id._ at p. 301 [159 L.Ed.2d 412]; _Apprendi, supra_, 530 U.S. at p. 490 [147 L.Ed.2d at p. 455].) When sentencing Buford to the upper term for robbery in count three, the court stated: "In the court's view the relationship between the victim and Mr. Buford was such that it certainly constitutes a betrayal of a close position of trust, and an unusually vulnerable victim in this matter, and again find those circumstances in aggravation outweigh those in mitigation." It cited the following reasons for sentencing Curry to the upper term for attempted murder in count one: "the degree of cruelty and callousness, lack of regard, the vulnerability of the victim in this matter, the length of the conduct involved in this case, all by far overtake any factors in mitigation which have been argued by your attorney on your behalf, youthfulness and lack of prior record. [¶] This is a case that

---

[7] Buford does not challenge imposition of the upper term for assault with a deadly weapon in count two which the court stayed.

on its facts and based on your conduct as well, in the Court's view, shocks the conscience and warrants the giving of the upper term." The court also imposed and stayed the upper term on the assault charge without further comment. Based on this record, we conclude Buford's and Curry's Sixth Amendment rights were violated by imposition of the upper term sentences.

 Denial of the right to jury trial on aggravating circumstances is reviewed under the harmless error standard set forth in *Chapman, supra*, 386 U.S. 18 [17 L.Ed.2d 705]. (*Sandoval, supra*, 41 Cal.4th at pp. 838–839, citing *Washington v. Recuenco* (2006) 548 U.S. 212 [165 L.Ed.2d 466, 476, 126 S.Ct. 2546]; and *Neder v. United States* (1999) 527 U.S. 1, 8–15 [144 L.Ed.2d 35, 119 S.Ct. 1827].) Under this standard, "we must determine whether, if the question of the existence of an aggravating circumstance or circumstances had been submitted to the jury, the jury's verdict would have authorized the upper term sentence." (*Sandoval, supra*, 41 Cal.4th at p. 838.) If we conclude, "beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the *Sixth Amendment* error properly may be found harmless." (*Id.* at p. 839, italics added.) The record in this case supports such a finding as to both Buford and Curry.

 As set forth in detail in the statement of facts, Buford and L.R. had dated for several months and Buford was the father of L.R.'s unborn child. L.R. was seven months pregnant at the time Buford gathered his friends to rob and beat her with the intent to cause a miscarriage. It is difficult to imagine a greater breach of trust against a more vulnerable victim. (Cal. Rules of Court, rule 4.421(a)(3), (4).)

Likewise, there is overwhelming evidence that Curry's actions were cruel and callous toward two vulnerable victims—L.R. and her unborn child. (Cal. Rules of Court, rule 4.421(a)(1), (3).) He kicked L.R. with both feet while she was on the ground and threw a metal garbage can on her head. Although L.R. asked to be taken to a hospital, Curry drove her around Sacramento and finally left her, bruised and bloody, at the side of the road. The fetus was in distress when L.R. arrived at the hospital.

Based on this record, we conclude a jury would have found the cited aggravating circumstances true beyond a reasonable doubt had they been given the opportunity. Accordingly, any *Apprendi/Blakely/Cunningham* error was harmless.

## DISPOSITION

The judgment is affirmed.

Sims, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied January 22, 2008, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied April 16, 2008, S160754. George, C. J., did not participate therein.