Filed 3/6/23  P. v. Ortiz CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C094307 |
| Plaintiff and Respondent, | (Super. Ct. No. CR-2020-3443) |
| v. | |
| LOUIS FERNANDO ORTIZ, | |
| Defendant and Appellant. | |

A jury found defendant Louis Fernando Ortiz guilty of attempted criminal threats and brandishing a pair of scissors and also found true he used a deadly weapon.  The trial court found enhancements for prior felony convictions true and sentenced defendant to 14 years in state prison, including the upper term on the criminal threat count.  On appeal, defendant argues there was insufficient evidence of attempted criminal threats.  He further argues the court erred in failing to instruct the jury on unanimity.  Finally, both parties agree this case should be remanded for resentencing due to legislative changes to

1

Penal Code section 1170, subdivision (b)(6)[1] pursuant to Assembly Bill No. 124 (2021-2022 Reg. Sess.)[2] because defendant's trauma may have been a contributing factor to his committing this offense.  After we notified the parties we were prepared to issue a decision without hearing oral argument, defendant sought leave to file supplemental briefs arguing his counsel rendered ineffective assistance by failing to seek pretrial diversion under section 1001.36 or, alternatively, the trial court erred when it failed to sua sponte consider defendant's eligibility for diversion.  Lastly, defendant argues remand is required for the trial court to consider his eligibility for mental health diversion under recent amendments to section 1001.36 effected by Senate Bill No. 1223 (2021-2022 Reg. Sess.).  We shall reject defendant's claims related to mental health diversion, affirm the convictions, but vacate the sentence and remand for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

An amended information charged defendant with assault with a deadly weapon (scissors) (§ 245, subd. (a)(1); count 1), criminal threats (§ 422; count 2), and

---

[1]  Undesignated statutory references are to the Penal Code.

[2]  Defendant cites Assembly Bill No. 124.  Assembly Bill No. 124 is not independently operative.  In 2021, three bills proposing changes to section 1170 were enacted by the Legislature and signed by the Governor on the same day:  Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5), Assembly Bill No. 1540 (2021-2022 Reg. Sess.; Stats. 2021, ch. 719, § 2), and Senate Bill No. 567 (2021-2022 Reg. Sess.; Stats. 2021, ch. 731, § 1.3).  (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038; *People v. Banner* (2022) 77 Cal.App.5th 226, 243, fn. 2 (conc. & dis. opn. of Detjen, J.) (*Banner*).)  Because Senate Bill No. 567 was the last bill the Governor signed and bears the highest chapter number, its amendments to section 1170 prevail over the amendments to that section specified in the other two bills.  (Gov. Code, § 9605, subd. (b); *In re Thierry S.* (1977) 19 Cal.3d 727, 738-739.)  However, Senate Bill No. 567 states that if that bill is enacted last of the three, section 1.3 of the bill incorporating the amendments proposed by Assembly Bill No. 124 and Assembly Bill No. 1540 shall become operative.  (Stats. 2021, ch. 731, § 3.)  Therefore, the amendments to section 1170, subdivision (b) that defendant contends were made by Assembly Bill No. 124 became operative only through Senate Bill No. 567.

misdemeanor brandishing (§ 417, subd. (a)(1); count 3). The information further alleged enhancements for the use of a deadly weapon as to count 1 and count 2, two prior serious felony convictions for purposes of count 1, and four additional prior serious felony convictions for purposes of sentencing. (§§ 12022, subd. (b)(1), 667, subd. (a)(1) & (e)(2).)

*The Victim's and His Wife's Testimony*

The victim, who lived across the street from defendant, heard a disturbance outside. He saw defendant acting upset and went to check on him. The victim told defendant, "Go home and relax. It's a good day. I don't know what's going on with you, but go home and relax." Defendant responded by yelling but turned to walk home. Police responded to this incident and left.

About a half-hour later, the victim met with some neighbors in his garage. The victim and his wife heard defendant yelling the victim's name, and "I know you're listening and I know you're jealous of me. [¶] . . . I'm going to drag you out of your house." His tone was threatening, and the victim feared defendant. The victim walked out of his garage in an attempt to defuse the situation. He saw defendant on his second story balcony and defendant said, "I'm going to fuck you up. I'm going to kick your ass. I'm going to drag you out [of] your fucking house." Defendant was swinging his arms and making random gestures, "threatening the air basically."

About five minutes later, defendant ran downstairs and charged at the victim with a knife in one hand and a pair of scissors in his other hand. Defendant adopted a fighting stance and held up the knife in a shaking gesture, like he was going to stab the victim, and held the scissors down by his side as a backup weapon.

During the altercation, defendant continued to say, "I'm going to fuck you up. Let's fight. Let's do this." The victim told his wife to go into the house, and testified defendant got within about 12 feet of him. The victim's wife testified the distance was more like six to eight feet.

3

As the victim moved backwards, defendant matched him step for step. His face was angry and turning red. Defendant ripped off his shirt. During the ensuing standoff, defendant alternated between threatening the victim and laughing.

The men engaged in this standoff for 10 to 15 minutes until the police arrived. During the standoff, defendant told the victim, "I'm going to fuck you up," and "I'm going to kick your ass." Defendant also said he was going to "lay you out," which the victim took to mean he was going to stab or try to kill him. The victim feared defendant would carry out that threat. Defendant also told the victim, "[g]et your family ready to bury you because you're 'bout to be dead.'" This made the victim mad.

When police sirens became audible, defendant walked away and threw the scissors in the bushes. The victim was angry and "fidgety" until the police arrived, and he told them defendant threatened his life. Minutes later, the victim was laughing and joking with his neighbors.

*Other Witness Testimony*

One of the neighbors called 911 because they saw defendant charge at the victim and his wife, aggressively lunge and yell, while holding a knife and a pair of scissors. This neighbor testified they thought there was a threat of an altercation. This neighbor ducked down during the altercation because they did not want to see what was going to happen.

A second neighbor heard yelling and walked out of his house and saw a man walking with a pair of scissors. The man then threw the scissors into the bushes, where they broke in half. The second neighbor also observed yelling between defendant and the victim. As defendant walked by this second neighbor, defendant said, "Hey, what's up man?" and shook his hand. Defendant appeared manic. Next, the second neighbor saw defendant run towards the victim, like he was getting ready to fight him, while the other man stood his ground. For 10 to 15 minutes, defendant circled around the victim and ran back and forth at the victim. This second neighbor said defendant could have been trying

4

to draw attention to himself and "it seemed like a game, like he was enjoying it, like it was fun."

A third neighbor, M.C., testified he ran outside and placed himself between defendant and the victim, because he did not want the victim to be hurt, and defendant backed off a bit. M.C. feared the interaction could have escalated to a physical altercation, but he did not believe this was a real possibility. According to M.C., the closest the two men ever got to each other was five or six feet. M.C. did not see anything in defendant's hands and could not hear what defendant said to the victim.

Finally, the victim's father testified. He saw defendant with a knife or weapon in his hands. Defendant was talking, threatening, and making gestures at his son. Defendant appeared upset and angry. The victim's father was concerned for his son's safety. He believed defendant was six to nine feet away from his son. By way of demonstration in the courtroom, the closest distance between the two was more like 20 feet.

*Verdicts and Sentencing*

The jury found defendant not guilty of assault with a deadly weapon (§ 245, subd. (a)(1)), the lesser included offense of simple assault (§ 240), and criminal threats (§ 422), but found him guilty of attempted criminal threats (§§ 21a/664, subd. (a)/422) and brandishing (§ 417, subd. (a)(1)). The jury also found true the enhancement he used a deadly weapon. (§ 12022, subd. (b)(1).)

The trial court originally sentenced defendant on May 13, 2021. Prior to that hearing, defendant submitted a statement in mitigation that highlighted numerous " 'mental health sick calls' " in his health records. The statement further claimed defendant had been diagnosed as schizoaffective, and his mood was described as hypomanic and dysphoric, for which he was prescribed lithium. Defendant's sister provided the prosecution with a statement that said defendant suffers from posttraumatic stress disorder and was sexually abused as a child. Further, defendant experiences

auditory hallucinations and self-inflicted wounds to his neck. Defense counsel asked the court to reduce the attempted threat count to a misdemeanor and asked the court to strike his prior strike convictions in the interest of justice.

The trial court declined to reduce the criminal threats offense to a misdemeanor, and sentenced defendant to 25 years to life on that offense, plus one consecutive year for using a deadly weapon, and two separate consecutive five-year terms for prior convictions. The trial court exercised its discretion based on defendant's mental health condition and struck two of the four 5-year prior conviction enhancements. The record before us demonstrates the trial court's frustration at the sentence it originally imposed, stating: "I don't like it, but I'm constrained to do it."

Subsequently, the prosecution filed a motion to recall defendant's sentence under section 1170, subdivision (d)(1), and defendant joined in that request. At that resentencing hearing, the trial court reduced defendant's sentence to 14 years, including the upper term of 18 months for the attempted threats doubled to three years due to his strike conviction, one year for the deadly weapon enhancement, and 10 years for the two prior strike convictions. The trial court struck three of the four prior strike enhancements (§ 667, subd. (e)(2)), and two of the four prior conviction enhancements (§ 667, subd. (a)(1)).

Defendant timely appealed. After delay for briefing continuances, the case was fully briefed in October 2022, and was assigned to this panel shortly thereafter.

## DISCUSSION

Defendant argues the evidence was insufficient to sustain his conviction for attempted criminal threats. Next, he argues the trial court erred in failing to instruct the jury sua sponte on unanimity. Defendant further argues his counsel was ineffective in failing to ask the trial court for pretrial diversion and/or the trial court erred by failing to sua sponte raise the issue, and that he is entitled to remand for the trial court to consider mental health diversion under recent amendments to section 1001.36. Lastly, he argues,

6

and the Attorney General agrees, this case should be remanded for resentencing because prior trauma may have been a contributing factor to his crimes. We reject all of the claims but the last and will remand for resentencing.

I

*Sufficiency of the Evidence*

Defendant's sufficiency of the evidence argument focuses on two issues: (1) "[T]he evidence did not show that [defendant] possessed the unequivocal intent to threaten death or great bodily injury," and (2) defendant's "behavior and statements were not sufficient to put a reasonable person in sustained fear of death or great bodily injury."

"In determining the sufficiency of the evidence to support a conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Leon* (2008) 161 Cal.App.4th 149, 156, italics omitted.) We review "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) " ' "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." [Citations.]' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)

The elements of a criminal threat are: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4)

7

that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.) An attempted criminal threat occurs "whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action. Furthermore, in view of the elements of the offense of criminal threat, a defendant acts with the specific intent to commit the offense of criminal threat only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat, under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the person to be in sustained fear for his or her own safety or for his or her family's safety." (*Id.* at pp. 230-231.)

The *Toledo* court listed three alternative circumstances of an attempted threat. Relevant here, the court explained: "[I]f a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*People v. Toledo, supra*, 26 Cal.4th at p. 231.)

"We determine whether the words used by appellant 'were sufficiently unequivocal, unconditional, immediate and specific they conveyed to the victim an immediacy of purpose and immediate prospect of execution of the threat' by considering 'all the surrounding circumstances and not just the words alone.' [Citation.] There is no requirement that the threat be unconditional, nor can we judge a threat 'solely on the

8

words spoken. It is clear by case law that threats are judged in their context.' [Citation.]" (*People v. Culbert* (2013) 218 Cal.App.4th 184, 190.)

Here, the evidence is sufficient to show defendant made a threat with the specific intent that it be taken as a threat and, in context, his conduct would put a reasonable person in sustained fear. We examine the whole of defendant's conduct, in context, starting with his outburst from the balcony, continuing to his charging the victim with a knife and a pair of scissors in the street, and ending with the standoff.

Defendant started this altercation by calling out the victim by name and, in an angry and threatening tone, saying he would drag the victim out of his house, he would "fuck" him up, and he would "kick [his] ass." He made his threats unequivocal, unconditional, immediate, and specific when he ran down the stairs five minutes later, charged at the victim holding a knife and a pair of scissors, and made slashing movements with the weapon in his right hand for 10 to 15 minutes until the police arrived. Worried for his wife, the victim told her to go into the house. Adding to the gravamen of this scenario, *while he was making stabbing motions with the knife*, defendant told the victim he was going to "lay [him] out" and he should "[g]et your family ready to bury you because you're 'bout to be dead." In context, defendant's conduct demonstrates he had the specific intent to threaten to stab and/or kill the victim, and substantial evidence supports the jury's finding of defendant's intent. While defendant's other erratic actions of laughing, appearing manic, and jumping back and forth may have been relevant, they did not conclusively negate he had the requisite intent. Instead, the jury weighed that testimony. They rejected defendant's argument he did not have that intent, and we will not reweigh their determination.

On the issue of the reasonableness of the sustained fear, the victim testified he was afraid of defendant when defendant charged at him with the knife and scissors, threatened to "lay [him] out," and said he should prepare his family to bury him. Evidence of the victim's fear, coupled with the circumstances described by the victim and the

9

witnesses—a man armed with a knife and a pair of scissors, shouting threats, and charging towards a person while making stabbing motions with the weapons—are sufficient to cause a reasonable person to be in sustained fear. This jury also heard the testimony of the neighbor who called 911 due to the altercation because that person thought something was going to happen. That neighbor ducked down, suggesting they were fearful, because they did not want to see what defendant was going to do to the victim with those scissors and that knife. Defendant's father testified he feared for his son's safety. This substantial evidence supported the jury's finding a reasonable person would be placed in sustained fear due to defendant's actions.

The evidence the neighbor, M.C., stepped between defendant and the victim, or the victim was calm after the police arrived, was evidence for the jury to consider in determining whether a reasonable person would suffer sustained fear as a result of defendant's actions. The jury rejected defendant's argument on this point, and it is not for us to reweigh the evidence on this disputed fact.

This case is distinguishable from the two cases cited by defendant: *In re Ricky T.* (2001) 87 Cal.App.4th 1132 and *People v. Teal* (1998) 61 Cal.App.4th 277. In *Ricky T.*, a minor became angry when a teacher accidentally hit him with a door, and the minor started cursing and saying he was going to kick the teacher's " 'ass.' " (*In re Ricky T.*, at p. 1136.) The minor made no other threats and engaged in no other acts of aggression. (*Ibid.*) The appellate court concluded those intemperate, rude, and insolent remarks did not suggest any gravity of purpose, were vague, and the absence of any other circumstances after the threats negated any finding the threat was a criminal threat. (*Id.* at pp. 1138-1139.)

By contrast, the record here demonstrates defendant repeatedly threatened the victim; punctuated those threats by charging at him armed with scissors and a knife; and held him at bay for 10 to 15 minutes until the police arrived. Properly instructed, the jury

10

found defendant committed attempted criminal threats. (*People v. Toledo, supra*, 26 Cal.4th at pp. 227-228, 230-231.)

The rule of *People v. Teal, supra*, 61 Cal.App.4th at page 281—mere angry utterances or ranting soliloquies do not constitute terrorist threats—only applies if those utterances or soliloquies are not communicated to anyone. *Teal* does not assist defendant as his threats were communicated directly to the victim.

II

*Unanimity Instruction*

Defendant next contends the trial court erred by failing to sua sponte instruct the jury on unanimity. We disagree.

As a general rule, when a violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the prosecution must select the particular act upon which it relies, or the trial court must instruct the jury to agree on which act to base a conviction. (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) When no election is made by the prosecution, the trial court has a sua sponte duty to instruct on unanimity. (*People v. Curry* (2007) 158 Cal.App.4th 766, 783.) But a unanimity instruction is not required if the case falls within the continuous course of conduct exception, "which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation] . . . [citation]. There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime." (*Jennings*, at p. 679; see *People v. Hernandez* (2013) 217 Cal.App.4th 559, 572.)

The acts giving rise to the criminal threat charge in this case were closely related in time and place. Defendant started his ranting and raving on the balcony of his home directed specifically at the victim by name, stating he was going to drag the victim out of his house. Next, he shouted, "I'm going to fuck you up. I'm going to kick your ass. I'm going to drag you out [of] your fucking house." Five minutes later, defendant ran

11

downstairs and charged out of his house at the victim with weapons in both hands, making stabbing motions with the implement in his right hand. During the face-to-face altercation, defendant continued to say, "I'm going to fuck you up. Let's fight. Let's do this." He and the victim circled one another for 10 to 15 minutes while defendant threatened to lay the victim out and told him to have his family prepare him for burial.

On this record, we conclude the trial court was not required to instruct the jury on unanimity because defendant's acts constituted a continuous course of criminal conduct. The acts were closely connected in time and place so as to form part of one transaction. (See *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1534 [the defendant's struggle with several officers within a short period of time constituted a continuous course of conduct not requiring unanimity instruction]; *People v. Jefferson* (1954) 123 Cal.App.2d 219, 221 [no unanimity instruction required where the defendant, using two different knives in two different locations within a period of 10 to 15 minutes, slashed at police officers because the acts occurred during "continuous effort on the part of the officers to disarm" him].)

Our conclusion is further supported by the offered defense. While defendant theorizes he could have raised different defenses to the different stages of this interaction, he did not. Instead, he argued to the jury his collective conduct was a challenge to a fight, not a threat to do great bodily harm. Further, he argued he had no intent to kill or inflict great bodily injury. Next, he argued his conduct was not so immediate, unconditional, and specific that it communicated a serious intention and an immediate prospect the threat would be carried out. Finally, he argued the victim had no sustained fear of defendant, and any fear he might have had was unreasonable.

Defendant's reliance on *People v. Melhado* (1998) 60 Cal.App.4th 1529 is misplaced. There, the defendant was charged with making terrorist threats to an auto repair shop owner. (*Id.* at pp. 1532-1533.) The defendant visited the shop at 9:00 a.m. and then again at 11:00 a.m., making threats each time and carrying what appeared to be an operable grenade during the second visit. (*Id.* at p. 1533.) During closing argument,

12

the prosecutor discussed both incidents, emphasizing the 11:00 a.m. incident, but never explicitly informing the jury of any election. (*Id.* at pp. 1535-1536.) The appellate court reversed, concluding the trial court should have instructed on unanimity, because each separate incident was sufficient to establish criminal liability and the prosecutor failed to clearly communicate to the jury which incident it should consider as the basis for conviction. (*Id.* at p. 1539.) *Melhado* is distinguishable because defendant here engaged in a single course of conduct over a mere 20 minutes.

III

*Mental Health Diversion*

In supplemental briefing, defendant argues his trial counsel rendered ineffective assistance by failing to seek pretrial diversion under section 1001.36 as that statute currently exists. Further, defendant argues the trial court erred when it failed to address this issue because it had a sua sponte obligation to do so. We disagree.

*A. Section 1001.36; Mental Health Diversion*

As originally enacted in 2018, section 1001.36, subdivision (a), gave the trial court discretion to grant a defendant pretrial diversion if the defendant met six different criteria. (Stats. 2018, ch. 34, § 24.) The legislative purpose of this diversion statute " 'is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders.' (§ 1001.35, subds. (a)-(c).)" (*People v. Frahs* (2020) 9 Cal.5th 618, 626.)

The statute has been amended four times since its enactment, and the parties agree the most recent version of the statute is the one we should apply. Given our resolution of

13

this case, *post*, we decline to decide whether the most recent change to this statute has retroactive application here.[3]

Under the version of the statute in effect when defendant committed the crime in 2020, and was tried and sentenced in 2021, section 1001.36 provided a trial court had discretion to grant pretrial diversion if it found all of the following: (1) the defendant suffered from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms would respond to mental health treatment; (4) the defendant consented to diversion and waived his or her speedy trial right; (5) the defendant agreed to comply with treatment; and (6) the defendant would not pose an unreasonable risk of danger to public safety if treated in the community. (Former § 1001.36, subd. (b)(1)(A)-(F); Stats 2019, ch. 497, § 203.)

While this appeal was pending, the governor signed Senate Bill No. 1223 (2021-2022 Reg. Sess.) (Stats. 2022, ch. 735, § 1), effective January 1, 2023, amending section 1001.36. As currently formulated, section 1001.36 provides a two-step review. (§ 1001.36, subds. (b) & (c).) Under the new statute, the court must first find a defendant is eligible for pretrial diversion if (1) The defendant has been diagnosed with qualifying mental disorder(s), and (2) the defendant's mental disorder was a significant factor in the commission of the charged offense. (§ 1001.36, subd. (b).)[4] If the defendant is "eligible," the trial court must then consider whether the defendant is suitable for pretrial

---

[3] We do not resolve this issue because we conclude defendant's argument for ineffective assistance of counsel fails because the record does not demonstrate counsel's failure to bring a motion for diversion was not a tactical decision, *post*. Thus, we do not reach the merits of whether defendant ultimately would have qualified for mental health diversion and which version of the statute should be applied to answer that question.

[4] The law now provides, "If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense." (§ 1001.36, subd. (b)(2).)

14

diversion utilizing the same four factors from the prior version of the statute outlined, *ante*. (§ 1001.36, subd. (c).)

   *B. Additional Factual Background*

At the close of the preliminary hearing, defense counsel told the trial court there were "some mental health issues." He argued, "a fair reading of the facts is [defendant] is having some type of episode, could be fueled by drugs, it could be fueled by mental health, depending upon the facts we heard today. It is just kind of a random thing." Counsel further told the trial court, in arguing the felony charges should be reduced to misdemeanors, "I will tell the Court that pursuant to 17(b) that [defendant] is experiencing mental health issues while in the jail as we speak. The Court can see a visible scar on [defendant's] head. There may have been, I'm not going to go in to detail. There are significant mental health issues with [defendant]. [¶] So, I think, what he experienced in the jail and this event are kind of tied together in a general mental health sense. I just don't think this case should be further prosecuted as a felony."

Prior to the trial, the prosecution asked that defendant's sister not be able to testify regarding her opinion as to defendant's mental health issues. When the trial court asked defense counsel if he would be presenting an expert on defendant's mental health, counsel responded, "No, that would only be relevant if [defendant] is convicted of a crime. [¶] . . . [¶] . . . To me, its primary relevance and maybe only relevance lies in the situation where if he's convicted of a crime it would be relevant for sentencing purposes."

As stated, *ante*, defense counsel raised defendant's mental condition again at defendant's original sentencing in another attempt to convince the trial court to reduce his felony conviction to a misdemeanor and/or strike his prior strike convictions in the interest of justice.

In declining to reduce the charge or strike the prior convictions, the trial court stated, it only had the sister's impressions of defendant before it, but did not have a

15

psychiatrist or a psychologist or medical professional's evaluation. In consideration of defendant's mental health condition, the trial court struck two of the five-year prior conviction enhancements.

At the agreed upon resentencing, the prosecution conceded it "believed mental health issues took a role in this. It did not rise to the level of making what happened not a crime, but we are attempting to account for that." The prosecution proposed an alternative sentencing, which resulted in the sentence defendant ultimately received of 14 years.

### C. Ineffective Assistance of Counsel

Defendant argues his counsel provided ineffective assistance because he failed to seek pretrial diversion due to defendant's mental health issues. We disagree.

Defendant's argument subsumes the concession his trial counsel failed to seek mental health diversion in the trial court. As noted by defendant, this remedy was available "well before the events that comprise this case occurred." Thus, it was defendant's obligation to raise this issue and provide the court with a diagnosis of or treatment for a diagnosed mental disorder. (Former § 1001.36, subd. (b)(1)(A); current § 1001.36, subd. (b)(1).) Thus, we are not confronted with the retroactivity issue faced in *People v. Frahs, supra*, 9 Cal.5th at page 626, where the defendant was convicted before the statute became effective.

Here, defendant's counsel's failure to raise this available diversion opportunity forfeited his ability to argue he is entitled to diversion on appeal. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [generally, a party forfeits consideration of an issue on appeal that could have been, but was not raised in the trial court].) Conceding such, defendant argues his counsel rendered ineffective assistance in failing to seek diversion.

"In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient, and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016)

16

2 Cal.5th 181, 198, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.) "[C]ertain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding." (*Mickel*, at p. 198.) "The record on appeal may not explain why counsel chose to act as he or she did. Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Ibid.*) We presume that counsel's actions fall within a broad range of reasonableness, and afford great deference to counsel's tactical decisions. (*Ibid.*) On direct appeal, a reviewing court will reverse a conviction based on ineffective assistance of counsel only if there is affirmative evidence that counsel had no rational tactical purpose for an action or omission. (*Ibid.*)

Defendant argues the record shows his attorney had no rational tactical purpose for failing to seek mental health diversion, and there is no satisfactory explanation for this choice. To the contrary, we conclude the record on appeal does not reveal why defense counsel did not request a hearing on defendant's eligibility for pretrial mental health diversion, and several possible rational reasons exist for that choice. For example, as he stated on the record, defense counsel may have strategically decided the best use of defendant's mental health issues was to attempt to mitigate defendant's sentence if he was convicted. In fact, defense counsel's efforts were successful in reducing defendant's ultimate sentence from a combined determinate and indeterminate sentence of 36 years to life to a determinate term of 14 years.

Moreover, counsel may have discussed the matter with defendant and found defendant was unwilling to place his mental health at issue, be subjected to mental health treatments or requirements, or to waive his right to a speedy trial. (Former § 1001.36, subd. (b)(1)(A), (b)(1)(D) & (b)(1)(E); current § 1001.36, subds. (b)(1), (c)(2) & (c)(3).) Or counsel may have concluded the trial court would likely find defendant was a danger

17

to public safety, specifically to the victim, and therefore not find defendant suitable for mental health diversion. (Former § 1001.36, subd. (b)(1)(F); current § 1001.36, subd. (c)(4).) The trial court expressed exactly this concern during sentencing when it said, "Ultimately, the public does need to be protected from [defendant's] behavior." Thus, on this record, we cannot conclude defense counsel's representation was deficient in failing to request a pretrial mental health diversion hearing.

*D. Sua Sponte Obligation*

Defendant further argues the trial court had a sua sponte obligation to consider defendant's eligibility for mental health diversion. We disagree.

Defendant bases his argument on the language of current subdivision (e) of section 1001.36 (former § 1001.36, subd. (b)(3)) coupled with the statute's intended purposes. Section 1001.36, subdivision (e) provides, in relevant part, "[a]t any stage of the proceedings, the court may require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion." As mentioned, *ante*, the legislative purposes for the mental health diversion statute include increasing diversion for persons with mental disorders while protecting the public, allowing local discretion and flexibility, and providing appropriate support and treatment for persons with mental disorders.

While we agree the purpose of the diversion statute is to increase the use of mental health diversion for appropriate persons, the statute uses the time-honored word "may" in describing the trial court's power in this regard. (*National Automobile etc. Co. v. Garrison* (1946) 76 Cal.App.2d 415, 417 [" 'Shall' means 'must' (Webster's New Inter. Dict. (1939), vol. 2, p. 2300), while 'may' means 'to have power' (Webster's New Inter. Dict. (1939), p. 1517)"].) By stating the trial court "may" hold a hearing, the Legislature gave the trial court the power, but not the obligation, to hold a mental health diversion hearing. In this regard, we agree with *Banner, supra*, 77 Cal.App.5th at page 233, that

18

the Legislature did not craft a scheme that "mandate[s] a sua sponte duty for trial courts to consider mental health diversion. After all, a defendant (or his counsel) is often best positioned to know whether mental health diversion is an appropriate outcome." (*Id.* at p. 235.) The Legislature knew how to write the statute in a manner that required the trial court to raise this issue sua sponte. It did not. (*Ibid*.)

We further reject defendant's argument the statute's requirement that he must "consent" to diversion is read out of the statute unless the trial court has a sua sponte obligation to consider this issue on its own motion. Defendant's consent or lack of consent only addresses the question of whether he will subject himself to mental health diversion, not to the trial court's obligation to undertake an examination of this issue on its own motion. (*Banner, supra*, 77 Cal.App.5th at p. 234.) While the court had that discretion, it was not required to exercise it.

## IV

### *Resentencing*

Defendant argues this case must be remanded for resentencing due to changes made to section 1170 during the pendency of his appeal. The Attorney General agrees. We accept the Attorney General's concession and shall remand for resentencing.

At the resentencing hearing held on May 27, 2021, the trial court selected the upper term of 18 months for attempted criminal threats.

Section 1170, subdivision (b)(6) now provides, in relevant part, "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." (§ 1170, subd. (b)(6).)

19

The Attorney General concedes these amendments are retroactive and apply to defendant's nonfinal case pending on appeal. We accept the Attorney General's concession. (See *People v. Flores* (2022) 75 Cal.App.5th 495, 500.) The parties also agree we should remand for resentencing, and we conclude remand is required under section 1170, subdivision (b)(6).

Here, the record contains recitals concerning defendant's childhood trauma and his mental health challenges. (See *Banner, supra*, 77 Cal.App.5th at p. 241.) While this information was known to the trial court, it did not have the benefit of section 1170, subdivision (b)(6) at resentencing and so logically did not conduct the analysis required by that section. Moreover, defendant had less incentive to develop a more detailed record due to the absence of this legislative direction.

When a sentencing court is unaware of the scope of its discretionary powers, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

While the court was able to reduce the initial sentence upon recall, the record does not clearly indicate the trial court would have imposed the upper term had section 1170, subdivision (b)(6) been in effect at the time. (*Banner, supra*, 77 Cal.App.5th at p. 242.) The trial court's frustration at the sentence it originally imposed suggests it may exercise its discretion differently on remand.

## DISPOSITION

Defendant's convictions are affirmed.  The sentence is vacated, and the case is remanded for resentencing.


|                          | /s/                    |
|                          | EARL, J.               |


We concur:


| /s/                      |
| RENNER, Acting P. J.     |


| /s/                      |
| HOCH, J.*                |

---

\* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.