Filed 1/30/25  P. v. Pineda CA1/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>JAIME PINEDA,<br><br>    Defendant and Appellant. | A163880<br><br>(Contra Costa County<br>Super. Ct. No. 05-201610-3) |

A jury found defendant Jaime Pineda guilty of 10 counts of child molestation involving the daughter of his longtime friend:  three counts of aggravated sexual assault on a child (counts 1 through 3); four counts of aggravated lewd acts on a child (counts 4 through 8); one count for lewd act on a child (count 9); and one count of contact with a minor for a sexual offense (count 10).  He was sentenced to state prison for 45 years to life, plus 28 years, which consisted of the upper terms for counts 7 through 9.

In his appeal from the judgment of conviction, defendant asserted claims of insufficient evidence, instructional error, and sentencing errors, including that the imposition of the upper terms was no longer valid in light of changes made to Penal Code section 1170[1] by Senate Bill No. 567 (2021–

---

[1]    Further undesignated statutory references are to the Penal Code.

2022 Reg. Sess.) (Senate Bill 567). In an unpublished opinion, we concluded the alleged error in imposing the upper terms was harmless, rejected defendant's other claims, and thus affirmed the judgment. (*People v. Pineda* (Oct. 25, 2023, A163880) [nonpub. opn.] (*Pineda*).)

Our Supreme Court granted review of that opinion and transferred the matter to this court with directions to vacate our decision and reconsider the cause in light of *People v. Lynch* (2024) 16 Cal.5th 730 (*Lynch*). We have reconsidered the matter after receiving supplemental briefs from the parties. Defendant argues, and we agree, that a remand for resentencing is required under *Lynch* because we cannot conclude beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt all of the aggravating factors on which the trial court relied to impose the upper terms in this case. Accordingly, we vacate our decision of October 25, 2023, reverse the sentence, and remand for a full resentencing. We otherwise affirm the judgment of conviction.[2]

## BACKGROUND

**The Evidence At Trial**

*Prosecution Case*

**Jane Doe's testimony**

Jane Doe was born in March 2007 and was 14 years old when she testified at trial. Defendant was a close friend of, and around the same age as, Doe's father.

Doe described a period of sexual encounters with defendant, beginning in the summer of 2018 when she was 11 years old. At that time, Doe lived with her father, mother, and younger brother in a studio in Richmond. The

---

[2] We restate here the portions of our prior opinion pertaining to issues unaffected by the grant of review. (See *post*, at pp. 14–29.)

studio had been converted from a garage and was attached to the main house, where defendant, his mother, sisters, niece, and cousins lived. A door connected the living room in the studio to the kitchen in the main house.

In late May 2018, Doe's brother was born prematurely and required hospitalization for approximately four months. Doe's parents spent much of their time at the hospital during these months. They wanted Doe to stay home and had defendant's mother watch her.

Some time that summer when her parents were at the hospital, Doe, who had a friend name Jaime (the same name as defendant's), contacted defendant on Instagram, mistakenly thinking he was her friend. She received a response from defendant and apologized for contacting him. Defendant replied, stating that she was "probably trying to contact [her] boyfriend."

Defendant continued to message Doe on Instagram, asking if he could come over to her part of the house and said he wanted a kiss from her. This made Doe uncomfortable. She did not want to do what defendant asked. Defendant would then come knocking on the windows when she was alone. This scared Doe, who told him to leave and did not let him in. He still kept asking over Instagram to kiss her, and she continued to say no. But there came a time when she was alone and let defendant inside, at which time he kissed her on the mouth.

For another two to four weeks, defendant continued to go to the studio and kiss Doe. Doe was scared, because she had never kissed anyone before. She wanted to tell her parents about it but felt she could not.

After weeks of kissing, defendant told Doe he wanted to have "intimate relations" with her, meaning sex. Doe was uncomfortable, as she did not know what the word "sex" meant. Throughout the summer, defendant kept

3

asking Doe about sex, and Doe would say no.

However, one day, without asking, defendant went over to Doe's studio. He then proceeded to take off her clothes and his own clothes, took her to the bed, put on a condom on his penis, and then inserted his penis into her vagina, which "hurt [her] a lot." After one or two minutes, defendant's son knocked on the window, and so he stopped, got dressed, and left.

One or two days after, defendant went back to the studio and again had intercourse with Doe. He told her not to tell anyone about what happened, and that she could not tell her parents. Doe was scared. She "didn't know anything" and "felt like if [she] was trapped."

After the second time they had sex, defendant went back to the studio and had sex with Doe again.

Between May 2018 and January 2020, defendant tried to have sex with Doe on a weekly basis. She recalled that while her brother was in the hospital, defendant would go to Doe's studio and have sex with her.

Defendant kept in touch with Doe over Instagram, asked her to send naked photos of herself, and told her at the end of each day of messaging to delete their messages so that her parents would not find the messages. Doe did not like defendant and did not ever think she was in a relationship with him.

In October 2018, Doe's brother came home after months of being in the hospital. Her father worked shifts as a delivery truck driver from around 4:00 a.m. until around 3:00 or 4:00 p.m. Her mother did not work at this time, and stayed home to watch Doe's brother.

In January 2019, defendant provided Doe with a Motorola cell phone so that he could communicate with her. Defendant again told Doe not to tell her parents about what was happening, which scared her, such that she could not

4

sleep on some nights. She was "afraid something bad might happen to [her] parents." Defendant told Doe to give him the phone every time it had no charge; he did not want Doe to charge it herself because her parents would find out about it. In addition to the cell phone, defendant gave Doe gifts, including a ring and a stuffed animal.

In March, Doe turned 12 years old. Although her brother was no longer at the hospital, he still had many medical appointments to attend. Doe's mother would take her brother to his appointments, and her father would be at work. And so, Doe would sometimes be at home by herself for 20 to 30 minutes. During that 20- to 30-minute window, defendant would go to Doe's studio and have intercourse with her. This occurred more than two, but less than five, times that month.

In late May, the day before Doe's brother's birthday, her parents and brother went to the airport to pick up her uncle and cousin. Defendant went to their studio, where Doe was by herself. He put her on her knees, told her to open her mouth, put his penis in her mouth, and used his hands to move her head backwards and forwards. Doe felt like she was going to choke, and she wanted to vomit. Defendant told her not to say anything. In addition, defendant put his mouth on Doe's vagina. Defendant also put Doe on the bed and had intercourse with her, which hurt her a lot.

In the month of May, defendant had intercourse with Doe less than five times.

Some time that summer, Doe's mother found a love letter that defendant had told Doe to write, prompting Doe's parents to watch her more closely and not leave her home alone anymore. Defendant then took back the cell phone he had given Doe, who "felt great" about no longer having the phone.

However, on one occasion in July, while Doe's father was at the store, her mother stepped outside briefly, and her uncle was in the kitchen, defendant opened the door to Doe's studio, had her go to his kitchen in the main house, and started kissing her. Defendant's niece saw them kissing. Defendant's mother found out about the kissing and told Doe's parents about it. Doe did not tell her mother about what defendant was doing to her, explaining she was afraid to tell her mother because defendant told her not to say anything.

Around the time that Doe went back to school that Fall, defendant gave Doe another cell phone. On the phone, he installed an application called "Signal," which they used to message each other.

In September, Doe's teacher discovered she had a cell phone and told her parents about it. Her parents then started watching Doe more carefully. Because of this, defendant handed Doe a sleep-inducing powder and told her to put it in her father's drink. She did not do so and threw it away.

In October, defendant continued giving Doe the powder and telling her to put it in her father's drink. Again, she threw it away. In addition, defendant placed a GPS tracker on Doe's father's car so that "he could have more time" with her. Defendant would go to Doe's studio and show her his phone, which was tracking her father's location in real time. Based on Doe's father's location, defendant timed when he engaged in sex acts with Doe. He had intercourse with her less than five times in October.

In November, defendant was still telling Doe to put the powder in her father's drink and using the GPS tracker to follow Doe's father around. Defendant had sex with Doe five or fewer times. And in December, defendant had sex with Doe two times.

Between May 2019 and January 2020, defendant had Doe put her

mouth on his penis between 10 and 20 times.

On January 10, 2020, when Doe's parents were at work and she was babysitting her brother at home, defendant went over to their studio. He sat down on the couch, started looking at his phone, and saw on the GPS tracker that Doe's father was far away from home. Defendant told Doe to leave her brother in the kitchen, took her to the bedroom, undressed Doe and himself, and engaged in intercourse with her. Defendant then put a liquid on Doe's back and, without warning, put his penis into her anus, which caused her "so much pain." Afterwards, defendant put Doe on her knees and inserted his penis into her mouth.

On January 13, Doe told her parents that she had a sexual relationship with defendant, and they went together to speak to the police. Initially, Doe told police she had only kissed defendant and denied he had touched her. However, in later interviews, she told police that defendant had sex with her, that he had put his penis in her mouth, and that they had anal sex.

Doe's father found the Instagram messages between defendant and Doe, printed out the messages, and gave the printouts to the police. He also found the second cell phone that defendant had given Doe, but the phone had apparently been wiped clean.

### Jane Doe's father's testimony

Eli A., Doe's father, testified that his son was born prematurely. He and Doe's mother were concerned for their son's survival and for about four months, would go to the hospital to be with him every day. During this time, Eli worked from 5:00 a.m. until anytime between 1:00 to 3:00 p.m., and then would go to the hospital from 4:00 p.m. to 10:00 p.m. At first, they would take Doe with them to the hospital, but they stopped doing so because she

was missing class. Doe's parents paid defendant's mother to keep an eye on Doe and pick her up from school, but Doe would be left alone at home sometimes.

Eli testified that since 2000 he had known defendant, who was a best friend and "like a brother." Eli was also close to defendant's family, as both families had emigrated here from close towns in El Salvador. Defendant's mother said that Eli's children were like her grandchildren. Eli let defendant borrow his car to see defendant's son, because Eli "felt [defendant's] son was as important as [Eli's] son to [Eli]." Eli also testified, I thought that [defendant] look[ed] at [Eli's] children as if they were [defendant's] own children.

In 2019, when his wife told him that defendant's niece saw Doe and defendant kissing, Eli spoke to Doe about it. He did not speak to defendant about it, as he instead chose to watch defendant more closely and confirm on his own whether Doe and defendant had a relationship.

Between 2016 and 2018 Doe did not have a cell phone. Eli had taken away her previous cell phone so that she could focus on school. However, in the fall of 2019, he received a call from one of Doe's teachers, who told him that she had a phone, which was not permitted. At that time, Doe did not tell her father about her relationship with defendant. She would later explain to her father that she was afraid to do so.

On January 13, 2020, Eli found Doe's cell phone amongst her clothing. When Doe told Eli who had given her the phone, he took her to the police to report it. When police first spoke to Doe, she mentioned only that defendant had kissed her. Eli then went to Doe's school that afternoon and was told by a girl at school that Doe had an Instagram account. Doe eventually gave Eli her Instagram account login and password. Eli logged in and found messages

8

between defendant and Doe from 2018 through 2019 that showed "they were indeed having a relationship." After he saw the messages, Doe told her father about her sexual relationship with defendant and started to cry. They went back to the police to report this.

Eli testified that Doe was scared and defendant had threatened her. "She said that [defendant] had told her that if she said anything about what was going on, her father would pay for it."

**Law enforcement testimony**

David Mathers, an inspector with the Contra Costa County District Attorney's Office assigned to investigate Internet crimes against children, testified he was familiar with the "Signal" application, which was used by defendant to message Doe. As part of his investigations, Mathers would use Signal and pose as a child and communicate with adults. Parties who have Signal on their devices are able to engage in secure communication using encryption, such that the messages cannot be read by anybody outside of the chain of communication. Another feature of Signal is that it allows the sender of a message to delete the message even after the other person receives it. The encryption system for Signal is incredibly strong; it is based on similar technology that the federal government uses for operations requiring secure communications, such as, for example, military communications. Signal can be downloaded for free on regular application stores.

### Defense Case

The defense's theory at trial was that defendant "is guilty" of engaging in sexual acts with Doe, but "not guilty of aggravated sexual assault or doing anything forcible with [her]." The defense argued that Doe was the one who was in love with defendant and that they essentially had a consensual

9

romantic relationship.

**Defendant's Family's Testimony**

Defendant's niece H.M., who was about the same age as Doe, testified that she and Doe would play outside together at the Richmond residence where they all lived. One day, H.M. saw defendant and Doe kissing and told her aunt about it.

Defendant's sister Nelly P. testified that H.M. had told her about seeing Doe and defendant kissing. Nelly saw a love letter that had hearts and the initials of both defendant and Doe. The letter said that Doe "was in love with him and she was going to do everything for him and to trust her." At that time, defendant was 33 years old and Doe was 11 years old. Nelly told her mother about the kiss, but did not contact authorities.

Defendant's mother Alma O. knew Doe's family from El Salvador and was close to Doe. After Nelly told her about defendant's inappropriate contact with Doe, defendant's mother talked to Doe and her mother. She also talked to defendant and told him not to kiss an 11 year old because it was illegal. Defendant told her he was not in any relationship with Doe and that she was the one always seeking him out.

### *Defendant's Testimony*

Defendant testified that Doe's father was one of his best friends and had known him since they were teenagers living in El Salvador.

In June 2018, defendant moved into a house in Richmond, the same house where Doe and her family were living. That was the first time he met Doe, whom he saw play games with his niece H.M. At that time, defendant was 33 years old, 22 years older than Doe.

When he moved into the Richmond house, defendant knew that Doe's parents had suffered an early birth of their son. He also knew that Doe was

10

spending a lot of time alone because her parents were at the hospital with her brother. Defendant agreed he started a relationship with Doe during this time. Defendant recalled the first time that Doe had sent him a message on Instagram. He first kissed Doe in July 2018.

In the weeks that followed, defendant would message Doe and tell her he wanted to kiss her. Besides kissing, defendant admitted he had vaginal sex with Doe several times when she was alone. He also admitted to having oral sex and anal sex with Doe.

Defendant recalled that in mid-to-late August 2018, he had vaginal intercourse with Doe for the first time. At that time, he entered Doe's home when she was alone, took her to the bedroom, took off her clothes, took off his own clothes, put on a condom, and then engaged in vaginal intercourse with her. Defendant knew she was in pain when this happened. He had to guide her through each step of what was happening because she did not understand what was happening. He testified "it's possible" he had told her not to tell anybody what had just happened because he did not want to get caught.

There were other, multiple occasions in August 2018 in which defendant had vaginal intercourse with Doe. He did not recall how many times he had sex with Doe between that time and the time he was arrested in January 2020.

Defendant testified that Doe performed oral sex on him more than ten times in 2019. According to defendant, Doe liked giving him oral sex. He also testified that he would place her hands on her head when she performed oral sex on him.

Also according to defendant, he and Doe were "boyfriend and girlfriend." He told Doe that he loved her "many times." They also talked about how he was going to wait until she became age of majority and marry

11

her. Doe never told him that she did not want to have sex with him.

Defendant told Doe to delete their messages at the end of each day because he did not want to be caught by Doe's father or the police. When Doe was 12 years old, defendant bought her a small cell phone because he did not want to be caught. Defendant downloaded the "Signal" application on the phone before giving it to her. He knew that Signal was encrypted on both ends, and therefore there was no way anybody else was going to see the conversations he was having with Doe. Defendant denied ever threatening Doe.

Defendant said that his relationship with Doe was not the first time he has had a relationship with a girl under the age of 15. When he was 26 and living in El Salvador, he attempted to have a sexual relationship with a 14-year-old girl. They could not have sex because they were in a car. He told her their relationship had to be kept a secret because he knew it was illegal to have that relationship.

When defendant was arrested in January 2020, he lied to the police. He said that Doe had called him and told him she had told the police that they had only kissed two or three times and that he should say the same thing. Defendant did so.

**Procedural History**

On November 13, 2020, the district attorney filed an information charging defendant with aggravated sexual assault of a child by means of rape (§§ 261, subd. (a)(2), 269, subd. (a)(1)) (count 1); aggravated sexual assault of a child by means of oral copulation (§§ 269, subd. (a)(4), 287, subd. (c)(2)(A) & (3)) (count 2); aggravated sexual assault of a child by means of sodomy (§§ 269, subd. (a)(3), 286, subd. (c)(2) & (3) (count 3); aggravated lewd act on a child (§ 288, subd. (b)(1)) (counts 4 to 8); lewd act on a child (§ 288,

12

subd. (a)) (count 9); and contact with a minor for a sexual offense (§ 288.3, subd. (a)) (count 10). The information also alleged that counts 4 through 9 constituted substantial sexual conduct with the victim. (§ 1203.066, subds. (a)(8), (b).) That special allegation as to count 9 was later stricken on the People's motion.

On August 30, 2021, a jury convicted defendant of all counts charged and found true the special allegation as to counts 4 through 8.

On October 7, the trial court sentenced defendant to an indeterminate term of 45 years to life, plus a determinate term of 28 years. The indeterminate term consisted of three, consecutive 15-years-to-life terms for counts 1, 2, and 3. The determinate term consisted of the upper terms for counts 7 through 9 (10 years, 10 years, and eight years, respectively); the midterms for counts 4, 5, and 6 (each 8 years); and the midterm for count 10 (three years), with the sentences for counts 4, 5, 6, and 10 to run concurrently to the sentences for counts 7 through 9.

Defendant appealed, and on October 25, 2023, this court affirmed the judgment. (*Pineda, supra*, A163880, at p. 39.)

Defendant petitioned for review to the Supreme Court. On January 11, 2024, the high court granted review. On December 18, it transferred this matter to us with instructions to vacate our prior decision and reconsider the cause in light of *Lynch, supra*, 16 Cal.5th 730. Following this transfer, the parties filed supplemental briefs regarding the impact of *Lynch*.

## DISCUSSION

### Substantial Evidence Supports Counts 1 through 8

Defendant first argues there was insufficient evidence of force, duress, menace, or fear to support the three counts of aggravated assault on a child

13

(counts 1 through 3), as well as the four counts of aggravated lewd acts on a child (counts 4 through 8). We disagree.

### *Applicable Law*

Aggravated sexual abuse of a child requires the commission of a specified act on a child who is under 14 years and at least seven years younger than the defendant. (§ 269, subd. (a).) Three of the sex acts specified are rape, sodomy, and oral copulation. (§ 269, subd. (a)(1), (3), (4)).) Convictions for these crimes require a finding that the sex acts were "accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on" the victim or another person. (*Ibid.* [incorporating §§ 261, subd. (a)(2); 286, subd. (c)(2) & (3); 287, subd. (c)(2) & (3)].)

Similarly, convictions for the aggravated lewd acts upon a child in counts 4 through 8 require a finding that the act was committed "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (§ 288, subd. (b)(1).)

Here, defendant does not dispute that the evidence was sufficient to demonstrate that he had engaged in various sex acts with a child over the relevant time period. Indeed, at trial he admitted to doing so. However, he argues there was insufficient evidence that he committed those sex acts by force, menace, fear, or duress.

At trial, the prosecution relied primarily on a theory of duress, and the People address only duress in their respondent's brief. Thus, we evaluate only whether there was substantial evidence of duress.

In the context of an aggravated lewd and lascivious act on a child under 14 years of age (§ 288, subd. (b)(1)), aggravated oral copulation (§§ 269, subd. (a)(4); 287, subd. (c)(2)(A) & (3)), and aggravated sodomy (§§ 269, subd.

14

(a)(3); 286, subds. (c)(2)(A) & (3), (d)), "duress" means " 'a direct or implied threat of force, violence, danger, *hardship* or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1004 (*Leal*); see CALCRIM No. 1015 (Oral Copulation by Force, Fear, or Threats); CALCRIM No. 1030 (Sodomy by Force, Fear, or Threats); CALCRIM No. 1111 (Lewd or Lascivious Act: By Force or Fear).) In the context of aggravated rape, section 261 defines "duress" in the same manner, except that it omits the term "hardship" from the definition. (§ 261, subd. (b)(1); *Leal*, *supra*, 33 Cal.4th at p. 1007; see CALCRIM No. 1000 (Rape or Spousal Rape by Force, Fear, or Threats).) However, similar factors are relevant to a determination of whether a defendant used duress to commit an aggravated sexual assault of a child based on an allegation of rape. (See *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072 (*Thomas*).)

The jury was to determine the existence of duress by considering the totality of the circumstances. (See *People v. Veale* (2008) 160 Cal.App.4th 40, 46 (*Veale*); § 261, subd. (b); CALCRIM Nos. 1000, 1015, 1030, 1111.) "The totality of the circumstances includes the victim's age, her relationship to the perpetrator, threats to harm the victim, physically controlling the victim when the victim attempts to resist, warnings to the victim that revealing the molestation would result in jeopardizing the family, and the relative physical vulnerability of the child." (*Thomas*, *supra*, 15 Cal.App.5th at p. 1072, citing *People v. Cochran* (2002) 103 Cal.App.4th 8, 13–14 (*Cochran*), disapproved on another ground in *People v. Soto* (2011) 51 Cal.4th 229, 248 & fn. 12 (*Soto*).) "The fact that the victim testifies the defendant did not use force or threats does not preclude a finding of duress." (*Thomas*, at p. 1072.) "The very

15

nature of duress is psychological coercion." (*Cochran*, at p. 15.)

When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319, superseded by 28 U.S.C. § 2254(d) on other grounds.) In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis what[so]ever there is sufficient substantial evidence to support' " the jury's verdict. [Citation.]' [Citation.]" (*Ibid.*) " 'Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Jones* (2013) 57 Cal.4th 899, 963.)

### *Analysis*

The totality of the evidence in this case is sufficient to support a finding that defendant molested Doe by means of duress, in violation of the aggravated sexual assault and aggravated lewd act statutes.

Doe was only 11 or 12 years old, thus more than two decades younger than defendant. In addition, defendant was a close friend of Doe's father, and Doe's parents trusted defendant's mother to watch Doe when they were away. Defendant was also physically close to Doe's family; the sex acts occurred in Doe's family's studio, which was part of and connected to the main house where defendant lived and, therefore, was easily accessible to defendant.

16

Further, the acts occurred when Doe was alone at home, mainly because her parents had to be with her brother at the hospital or at work. All of these circumstances bear upon Doe's susceptibility to being molested by defendant.

There was also evidence that Doe feared defendant. Doe testified she was afraid of defendant and did not want to engage in the kissing or sex acts urged by defendant. Initially, defendant asked Doe if he could come over and kiss her, which made her feel scared and uncomfortable. When she reluctantly submitted to his repeated requests, he moved on to asking for intercourse, which again made her feel uncomfortable and which she initially refused. One day, without asking, defendant went to Doe's studio and proceeded to have intercourse with her. Defendant continued to engage in intercourse, as well as other sex acts such as oral copulation and sodomy, with Doe, who experienced physical pain during some of these acts. Defendant repeatedly told Doe not to tell anyone about what he was doing to her. Doe was afraid that "something bad might happen to [her] parents" and was told by defendant that "her father would pay for it" if she disclosed the abuse. Doe was so afraid that she could not sleep on some nights.

Viewing the evidence in totality and in the light most favorable to the judgment, we conclude there was substantial evidence of duress. The evidence demonstrates a vulnerable, isolated child who was compelled to participate in sex acts by defendant, who held a position of trust. A jury could reasonably conclude that defendant made an implied threat sufficient to support a finding of duress, based on evidence Doe feared defendant and was afraid that if she told anyone about the molestation, defendant would harm her father or mother. (See, e.g., *Veale*, *supra*, 160 Cal.App.4th at p. 47.)

Defendant nonetheless argues there is insufficient evidence of duress, relying on *People v. Hecker* (1990) 219 Cal.App.3d 1238 (*Hecker*) (overruled in

part in *Soto*, *supra*, 51 Cal.4th at page 248, footnote 12), and cases citing it, such as *People v. Espinoza* (2002) 95 Cal.App.4th 1287 (*Espinoza*).

In *Hecker*, the defendant began molesting his stepdaughter when she was twelve years old. (*Hecker*, *supra*, 219 Cal.App.3d at p. 1241.) The court found insufficient evidence of duress where there was no evidence that the defendant expressly or implicitly threatened the victim; the victim admitted she was never consciously afraid defendant would harm her and testified that with the exception of defendant's pushing her head down during the act of oral copulation, he never used physical force. (*Id.* at p. 1250.) Also, although the victim stated she felt " 'pressured psychologically' " and was " 'subconsciously afraid,' " there was no evidence defendant was aware of and sought to take advantage of such fear. (*Ibid.*) The *Hecker* court observed, " '[p]sychological coercion' without more does not establish duress. At a minimum there must be an implied threat of 'force, violence, danger, hardship or retribution.' " (*Id.* at pp. 1250–1251.)

In *Espinoza*, the defendant was convicted of sexually abusing his 12-year-old daughter, who had recently moved in with him and resided there for one month. (*Espinoza*, *supra*, 95 Cal.App.4th at pp. 1292–1294.) Relying on *Hecker*, the *Espinoza* court found insufficient evidence of duress, because there was no evidence of a " 'direct or implied threat' of any kind." (*Espinoza*, at p. 1321.) The court reasoned that the defendant did not grab, restrain, or corner the victim, and the victim did not cry or resist while defendant lewdly touched her and attempted intercourse with her. (*Id.* at p. 1320.) It stated: "While it was clear that [the victim] was afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to continue to molest her. It would be circular reasoning to find that her fear of molestation established that the molestation was

18

accomplished by duress based on an implied threat of molestation." (*Id.* at p. 1321.)

Defendant's reliance on *Hecker* and *Espinoza* is misplaced. For one, the reasoning of those cases has been questioned by subsequent decisions. In *Cochran*, the same court that decided *Hecker* subsequently disagreed with the statement in *Hecker* that psychological coercion, without more, is insufficient to support a finding of duress. (*Cochran, supra,* 103 Cal.App.4th at p. 15.) The *Cochran* court found that the language used in *Hecker* was "overly broad," and clarified that "[t]he very nature of duress is psychological coercion." (*Ibid.*; see *Veale, supra,* 160 Cal.App.4th at pp. 47–48 [distinguishing *Hecker* and *Espinoza* on the basis of *Cochran*].) Also, our Supreme Court later approved a definition of duress in child molestation cases that parallels *Cochran*, not *Hecker*, describing duress as "us[ing] some form of psychological coercion to get someone else to do something." (*Soto, supra,* 51 Cal.4th at p. 243.) We thus agree with *Cochran* that a finding of duress does not necessarily require something more than psychological coercion.

Further, *Hecker* and *Espinoza* are distinguishable. Unlike the victim in *Hecker*, Doe in this case testified she was actually afraid of defendant. And unlike in both *Hecker* and *Espinoza*, the record here contains evidence of an implied threat of not only defendant's continued molestation of Doe, but also of retribution to her family were she to disobey defendant's demands that she not tell anyone about the abuse. As noted, Doe's father testified that defendant had told Doe not to tell anyone about the abuse or else her father would "pay for it." And Doe testified that she was afraid that "something bad might happen" to her parents if she disclosed the abuse. Although defendant acknowledges this evidence, he suggests that neither the testimony of Doe

19

nor her father was credible, and that we should instead credit defendant's own testimony that he told Doe not to tell anyone simply because he did not want to get in trouble with the police or with her father. We decline his invitation to reweigh the evidence, which is in violation of the principles of substantial evidence review. (*People v. Manibusan, supra,* 58 Cal.4th at p. 87.)

In short, there was substantial evidence that defendant used duress when committing the offenses in counts 1 through 8. Because the record contains substantial evidence supporting a finding of duress, we need not reach defendant's assertions of whether there was also sufficient evidence that he used force, menace, or fear to accomplish the challenged convictions. (See *Cochran, supra,* 103 Cal.App.4th at p. 16 ["Since we have found duress, we need not discuss whether force was also present"]; see also §§ 269, subd. (a); 261, subd. (a)(2), 286; subd. (c)(2), 287; subd. (c)(2); 288, subd. (b)(1) [the act is deemed an aggravated offense if it is accomplished "by means of force, violence, duress, menace, *or* fear of immediate and unlawful bodily injury"], italics added.)

### The Court Did Not Err In Failing to Sua Sponte Give Additional Instruction on Force

With respect to the aggravated sexual assault offenses charged in counts 1 through 3, the trial court instructed the jury using CALCRIM Nos. 1000, 1015, and 1030, respectively. These instructions state that an element of the crime of aggravated sexual assault of a child is that the defendant "accomplished the [intercourse, oral copulation, or sodomy] by force, duress, menace, or fear of immediate and unlawful bodily injury to someone." (CALCRIM Nos. 1000, 1015, 1030.) The jury was instructed on this element, along with the definition of "duress," but not "force" (or "menace" or "fear"). Defendant argues that the trial court erred in failing to

20

sua sponte instruct the jury on the definition of "force" in connection with the aggravated sexual assault offenses charged in counts 1 through 3.

We review defendant's claim of instructional error de novo (*People v. Waidla* (2000) 22 Cal.4th 690, 733), and conclude it lacks merit.

Defendant argues that the trial court should have instructed the jury with the bracketed definition of force provided in CALCRIM Nos. 1000, 1015, and 1030 as follows: "[[the particular sex act] is accomplished by force if a person uses enough physical force to overcome the woman's will]."

However, defendant acknowledges that the Bench Notes in CALCRIM Nos. 1000, 1015, and 1030 state: "The term 'force' as used in the [forcible sexual offense] statutes does not have a specialized meaning and [the] court is not required to define the term sua sponte. ([*People v.*] *Griffin* [(2004)] 33 Cal.4th [1015,] 1023–1024 [(*Griffin*)].)" The Bench Notes explain that in the context of aggravated sexual assault of a child based on rape: "In *People v. Griffin*, [*supra*,] the Supreme Court further stated, [¶] [n]or is there anything in the common usage definitions of the term 'force,' or in the express statutory language of section 261 itself, that suggests force in a forcible rape prosecution actually means force '*substantially* different from or *substantially* greater than' the physical force normally inherent in an act of consensual sexual intercourse. [Citation.] To the contrary, it has long been recognized that 'in order to establish force within the meaning of section 261, subdivision (2), the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim].' [Citation.]" (CALCRIM Nos. 1000, 1015, and 1030, citing *Griffin*, at pp. 1023–1024.) Cases have held that these concepts in *Griffin* apply equally to the crimes of aggravated oral copulation (*People v. Guido* (2005) 125 Cal.App.4th 566, 576) and aggravated

21

sodomy (*People v. Hale* (2012) 204 Cal.App.4th 961, 977–979).

Defendant further acknowledges that the Bench Notes in CALCRIM Nos. 1000, 1015, and 1030 also state that the Judicial Council "has provided a bracketed definition of 'force,' consistent with . . . *Griffin*, *supra*, that the court may give *on request*." (CALCRIM Nos. 1000, 1015, and 1030, italics added.)

Finally, defendant acknowledges that he did not request the additional instruction on force in the trial court.

We find no error in the trial court failing to give the bracketed instruction on "force" in connection with counts 1 through 3 because defendant did not request it or otherwise object to the instructions as given. As defendant admits, the trial court had no sua sponte duty to so instruct. (See *Griffin*, *supra*, 33 Cal.4th at pp. 1023–1024; accord, *People v. Guido*, *supra*, 125 Cal.App.4th at p. 576; see also CALCRIM Nos. 1000, 1015, and 1030.)

And even assuming the court's omission was error, it was harmless under the *Chapman* standard or the *Watson* standard.[3] Defendant does not argue the jury was improperly instructed on duress and, as discussed *ante*, there was substantial evidence of duress to sustain counts 1 through 8. Therefore, we conclude that the court's failure to give a specialized definition of force would not have changed the outcome of the jury's verdicts on counts 1

---

[3]     Errors that are a matter of state law only are subject to the standard in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which requires reversal if "it is reasonably probable that a result more favorable to [defendant] would have been reached." Errors that amount to federal constitutional error are subject to review under the *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) standard, which requires reversal unless the error is harmless beyond a reasonable doubt.

through 3.

**The Failure to Give the Modified Unanimity Instruction Was Harmless**

Defendant next argues the trial court erred in instructing the jury on the requirement of unanimity using CALCRIM No. 3500, instead of CALCRIM No. 3501. The People argue the trial court properly instructed the jury and, in any event, any error was harmless. We conclude that any error in failing to instruct the jury using CALCRIM No. 3501 was harmless.

*Applicable Law*

A criminal defendant's right to a jury trial includes the right to a unanimous agreement, including unanimous agreement on the act constituting the offense charged. (Cal Const., art. I, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132.) In any case in which the evidence would permit jurors to find the defendant guilty of a crime based on two or more discrete acts, either the prosecutor must elect among the crimes, or the court must require the jury to agree on the same criminal act. (*People v. Russo, supra*, 25 Cal.4th at p. 1132.) This unanimity requirement " 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (*Ibid*.) Where it is warranted, the court must give the instruction sua sponte. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.)

Here, based on CALCRIM No. 3500, the standard instruction on unanimity, the trial court instructed the jury: "The defendant is charged with separate offenses in Count[s] 1-10. [¶] The People may have presented evidence of more than one act to prove that the defendant committed each of these offenses. With regards to each separate charge, you must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act

23

he committed."

In *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*), our Supreme Court addressed how to instruct a jury on the requirement of a unanimous verdict in child molestation cases. *Jones* was particularly concerned with the typical situation in which the victim gives "generic" testimony about the abuse, meaning "the victim typically testifies to repeated acts of molestation occurring over a substantial period of time but, lacking any meaningful point of reference, is unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assaults" (e.g., "an act of intercourse 'once a month for three years' "). (*Id.* at pp. 299, 314.) The court rejected "the contention that jury unanimity is necessarily unattainable where testimony regarding repeated identical offenses is presented in child molestation cases. In such cases, although the jury may not be able to readily distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described." (*Id.* at p. 321.) Thus, the court concluded, a victim must only provide evidence with respect to the kind of act or acts committed, the number of acts, and the general timeframe in which the acts occurred. (*Id.* at p. 316; see *ibid.* [While "[a]dditional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony," they are "not essential to sustain a conviction"].) So long as the victim does so, there is "no constitutional impediment to allowing a jury, so instructed, to find a defendant guilty of more than one indistinguishable act . . . ." (*Id.* at p. 321.)

To safeguard the constitutional requirement of unanimity under these circumstances, the *Jones* court further directed as follows: "In a case in which the evidence indicates the jurors might disagree as to the particular

24

act defendant committed, the standard unanimity instruction should be given. [Citation.] But when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim." (*Jones*, *supra*, 51 Cal.3d at pp. 321–322.)

Pursuant to *Jones*, the Judicial Council adopted CALCRIM No. 3501, which provides: "The defendant is charged with <insert description[s] of alleged offense[s]> [in Count[s] __] sometime during the period of _____ to _____. [¶] The People have presented evidence of more than one act to prove that the defendant committed (this/these) offense[s]. You must not find the defendant guilty unless: [¶] 1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed [for each offense]; [¶] OR [¶] 2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved that the defendant committed at least the number of offenses charged]."

Thus, "CALCRIM No. 3501 affords two different approaches for the jury to reach the required unanimity. The first is the same as that set forth in CALCRIM No. 3500: agreement as to the acts constituting each offense. But unanimity may also be found under CALCRIM No. 3501 if the jury agrees 'that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved that the defendant committed at least the number of offenses charged].' " (*People v.*

25

*Fernandez* (2013) 216 Cal.App.4th 540, 556.)

We review the failure to give the proper unanimity instruction de novo. (*People v. Waidla, supra*, 22 Cal.4th at p. 733.)

### *Analysis*

Defendant argues the trial court should have instructed the jury using CALCRIM No. 3501, instead of CALCRIM No. 3500, with respect to the aggravated lewd act charges in counts 4 through 8, because those charges were based on generic testimony from Doe.[4] Defendant suggests Doe's testimony was the type of testimony addressed by the Supreme Court in *Jones* and for which the modified unanimity instruction contained in CALCRIM No. 3501 was drafted.

As explained by the prosecutor in closing argument, count 4 was for when Doe performed oral sex on defendant in 2019, which Doe explained happened between 15 to 20 times. Count 5 was for the oral sex that defendant performed on Doe around the time of her brother's birthday in late 2019, when her family went to the airport to pick up Doe's uncle and cousin. Count 6 was for the times in 2019 when defendant engaged in intercourse with Doe, which the prosecutor described as a "month-to-month ratio, or frequency." Doe was asked month by month whether defendant had sex with her, and she testified to a range of times he had done so. Count 7 was for the times in 2018 when defendant engaged in intercourse with Doe, which she testified occurred (without specifying how many times) when her family attended her father's soccer games without her in October and November. Finally, count 8 was for the first time that defendant raped her in August 2018.

---

[4] Defendant did not object to the instruction of the jury with CALCRIM No. 3500 or propose instruction of the jury instead with CALCRIM No. 3501.

26

As reflected above, the evidence presented in support of counts 4 through 8 was a mix of generic and specific testimony. The evidence in support of counts 5 and 8 was specific. The evidence in support of counts 4, 6, and 7 were generic in nature and the prosecutor did not elect a specific act for each of those counts. Given this, CALCRIM No. 3501 would have been the more appropriate instruction to give as to counts 4, 6, and 7.

However, any error in not instructing the jury with CALCRIM No. 3501 was harmless beyond a reasonable doubt.[5] As explained in the context of a completely omitted unanimity instruction, when " 'the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless . . . [beyond a reasonable doubt]. [Citation.] Where the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless. [Citation.]" (*People v. Curry* (2007) 158 Cal.App.4th 766, 783.) Put another way, the failure to give the unanimity instruction is harmless error where " 'the jury's verdict implies that it did not believe the only defense offered.' " (*People v. Deletto* (1983) 147 Cal.App.3d 458, 468.)

Here, the defense did not present any evidence or argument that might focus doubt as to any specific act of abuse as distinguished from any other act

---

[5] There is a split of authority whether courts should apply *Chapman* or *Watson* in assessing prejudice due to a court's failure to give an unanimity instruction. (See *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545 & fn. 7.) As both parties apply the more stringent *Chapman* standard, we will do so here as well.

of abuse. Indeed, defendant admitted that he had engaged in all of the sex acts described by Doe. His only defense was that the sex acts were consensual and, therefore, he committed *none* of the aggravated lewd act charges against him. As such, the defense did not discuss *how many* different lewd acts occurred. Rather, both the prosecutor and defense counsel focused their argument on why the jury should accept or reject Doe's testimony in its entirety. The jury's guilty verdicts on all counts indicate they believed Doe and rejected the only defense offered—they concluded that defendant had committed everything of which he was accused. Accordingly, there is no reasonable basis for believing that the jury disagreed as to particular acts committed. Thus, the failure to instruct the jury with CALCRIM No. 3501 was harmless beyond a reasonable doubt.

## A Remand for Resentencing Is Required Under *Lynch*

### Additional Facts

In imposing the upper terms for counts 7, 8, and 9, the trial court provided the following explanation:

"This is a case in which the defendant chose to victimize a particularly vulnerable victim, a very young girl who he established a relationship with because of traumatic events in the girl's family's lives and because he was friends with her dad and he took advantage of those positions of trust and— the victim was not just vulnerable because she was young but because of the circumstances that exposed her to great vulnerability.

"And it's particularly despicable that the defendant would have taken advantage, and that's not even giving it a fair assessment of that situation in the most horrible way. . . . [I]f we were to liken our society to fabric, then he gashed a hole into the fabric of our society that will last for generations. That young girl—her parents, they will not trust anyone for decades probably to

28

come close to their family.  They will not trust them or their kids, their grandchildren or their great grandchildren to be alone with a person again.  It's a horrible gash in the fabric of that family, multigenerational.

"And it's a horrible factor in aggravation.  The defendant used sophisticated means to bring the young girl under his power.  He exposed her to things that she should not have been exposed to at that age, and for many years after, ever.  There were opportunities to reflect in between each time he committed these offenses because they went on for many months.  And after reflection, he re-committed the offenses.  In fact, they became more aggravating as they progressed.  [¶] . . . [¶]

"And as I look at the factors in mitigation, [it] appears the only factor in mitigation of any significance is that the defendant hasn't been convicted of any crimes before, but those factors in mitigation pale in comparison to the factors in aggravation.  For those reasons, I'm going to impose the aggravated terms."

### *The Law*

When defendant was sentenced, section 1170, subdivision (b) specified that "[w]hen a judgment of imprisonment [wa]s to be imposed and the statute specifie[d] three possible terms, the choice of the appropriate term . . . rest[ed] within the sound discretion of the court."  (§ 1170, former subd. (b).)

Effective January 1, 2022, Senate Bill 567 amended section 1170 to provide that a trial court "shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)."  (§ 1170, subd. (b)(1); Stats. 2021, ch. 731, § 1.3.)  In turn, subdivision (b)(2) of the statute provides that "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of

29

imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial . . . ." (§ 1170, subd. (b)(2).)[6] Thus, Senate Bill 567 "made the middle term of imprisonment the presumptive sentence" unless aggravating factors admitted or proved beyond a reasonable doubt justify the upper term. (*People v. Achane* (2023) 92 Cal.App.5th 1037, 1041.)

The Courts of Appeal have uniformly held, and we conclude in this case, that this amendment applies retroactively to defendants like defendant here whose judgments were not final on direct appeal at the time the statute took effect. (See *Lynch*, *supra*, 16 Cal.5th at p. 749; *In re Estrada* (1965) 63 Cal.2d 740, 745; *People v. Jones* (2022) 79 Cal.App.5th 37, 44.)

What remained was how to decide when a remand for resentencing would be required. (*Lynch*, *supra*, 16 Cal.5th at pp. 742, 746.) Before *Lynch* was decided, the Courts of Appeal were split on the "type of prejudice" inquiry to apply when a trial court employed a former version of section 1170, subdivision (b), and relied on facts not proved in compliance with current section 1170, subdivision (b), to impose the upper term. (*Lynch*, at pp. 745–746.) In *Lynch,* our Supreme Court held that "a Sixth Amendment violation occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have

---

[6]     Likewise, rule 4.420(b) of the California Rules of Court has been amended to provide that the trial court "may only choose an upper term when (1) there are circumstances in aggravation of the crime that justify the imposition of an upper term, and (2) the facts underlying those circumstances have been (i) stipulated to by the defendant, (ii) found true beyond a reasonable doubt at trial by a jury, or (iii) found true beyond a reasonable doubt by the judge in a court trial." (Further rule references are to the California Rules of Court.)

been properly established." (*Lynch*, at p. 768.) Such a "violation is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true *all* of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements." (*Ibid.*, italics added.) "If the reviewing court cannot so determine, applying the *Chapman* standard of review, the defendant is entitled to a remand for resentencing." (*Lynch*, at p. 768.)[7]

### *Analysis*

As mentioned, the trial court relied on six aggravating factors to impose the upper terms for counts 7, 8 and 9: (1) the victim was particularly vulnerable (rule 4.421(a)(3)); (2) defendant took advantage of a position of trust to commit the offenses (rule 4.421(a)(11)); (3) the manner in which the crimes were carried out indicated planning, sophistication, or professionalism (rule 4.421(a)(8)); (4) defendant's acts ruined Doe, her family, and future generations of their family, and their ability "to trust anyone" to "come close to their family" "for decades"; (5) defendant had opportunities to, and did, reflect between committing the offenses; and (6) the crimes became more aggravated over time.

There is no dispute that these aggravating circumstances were not

---

[7] *Lynch* further held that that the amendment "altered the scope of the trial court's discretion." (*Lynch*, *supra*, 16 Cal.5th at p. 743.) As a result, even if a reviewing court can determine beyond a reasonable doubt that all of the aggravating factors would have been found true, a remand is still required unless "the record . . . clearly indicate[s] that the [trial] court would have found an upper term justified had it been aware of its more limited discretion" resulting from the presumption against upper-term sentences. (*Id.* at pp. 743, 773–774.) We need not reach this stage of the analysis to conclude that a remand is required here.

31

based on facts proved in conformity with the current version of section 1170, subdivision (b)(2).  (*Lynch*, *supra*, 16 Cal.5th at pp. 742–743.)

In determining whether this violation warranted a remand, in our prior opinion we applied a *Chapman* harmless error analysis to the first three aggravating circumstances listed above, i.e., those that were based on the aggravating circumstances specified in rule 4.421(a).  (*Pineda*, *supra*, A163880, at pp. 32–36.)  We concluded the evidence at trial established beyond a reasonable doubt that a jury applying that same standard would have found true those three circumstances.  (*Ibid*.)

We commented briefly on the fourth, fifth, and sixth aggravating circumstances that were not based on the factors enumerated in rule 4.421(a).  We observed, "With the exception of the increasing severity of the sexual assaults, the other factors"—defendant's acts ruined Doe and her family and their ability to trust anyone, and defendant had opportunities to reflect between committing the crimes—"are not so clear cut, as they appear to rely on somewhat subjective standards rather than a straightforward finding of facts."  (*Pineda*, *supra*, A163880, at p. 36, citing *People v. Sandoval* (2007) 41 Cal.4th 825, 840 (*Sandoval*), superseded by statute on another ground as stated in *Lynch*, *supra*, 16 Cal.5th 730.)  However, we found it unnecessary under a pre-*Lynch* standard of prejudice to decide whether the jury also would have found true these remaining aggravating circumstances. (*Pineda*, *supra*, A163880, at pp. 36–37.)

*Lynch* makes clear that our prior prejudice analysis is no longer valid. Under *Lynch*, the imposition of the upper terms under former section 1170, subdivision (b) requires a remand unless we could conclude beyond a reasonable doubt that a jury applying that same standard would have been found true *all* of the aggravating circumstances relied upon by the trial court.

(*Lynch*, *supra*, 16 Cal.5th at pp. 743, 768.)

The People argue that "Nothing in the *Lynch* decision changes the analysis of [the first three] aggravating factors" listed above. The People further contend that in applying the *Chapman* analysis to the remaining factors, we could conclude a jury would have found those factors true beyond a reasonable doubt. Defendant does not appear to dispute the People's argument except as to the fourth and fifth aggravating circumstances. He contends, "At least come [*sic*] of the factors outlined by the trial court were based on a subjective analysis, as this court's earlier opinion acknowledged." Thus, defendant maintains that we cannot conclude a jury would have found true the fourth and fifth aggravating circumstances beyond a reasonable doubt.

We agree with defendant. Our Supreme Court has cautioned against attempting to determine whether a jury would have found true aggravating circumstances that require "an imprecise quantitative or comparative evaluation of the facts." (*Sandoval, supra,* 41 Cal.4th at p. 840.) " ' "[T]o the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." ' " (*Lynch, supra*, 16 Cal.5th at p. 775, citing *People v. Boyce* (2014) 59 Cal.4th 672, 728–729 and *Sandoval, supra*, 41 Cal.4th at p. 840.) Such is the case here. We observed in our prior opinion— and it remains true—that whether defendant's acts ruined the ability of Doe, her family, and their family's future generations to "trust anyone for decades . . . to come close to their family," and whether defendant had opportunities to and did reflect between committing the crimes, are relatively subjective or

33

vague inquiries, not capable of precise determination. (*Pineda*, *supra*, A163880, at p. 36, citing *Sandoval, supra,* 41 Cal.4th at p. 840.) As such, we cannot confidently conclude that a jury would have found these factors true beyond a reasonable doubt.

Because we cannot find the omission of a jury finding harmless beyond a reasonable doubt as to the fourth and fifth aggravating circumstances cited by the trial court when it imposed the upper terms on counts 7 through 9, defendant's sentence must be vacated and the matter remanded for a full resentencing. (*Lynch*, *supra*, 16 Cal.5th at pp. 743, 768.)[8] For this reason, we need not address the other unproved aggravating circumstances.

Moreover, because we are remanding for a full resentencing, we need not address defendant's additional challenge to the imposition of consecutive sentences on counts 1 through 3. (See *People v. Walker* (2021) 67 Cal.App.5th 198, 204 [when an appellate court remands a case for resentencing, the trial court is entitled to consider the entire sentencing scheme and may reconsider all sentencing choices], citing *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## DISPOSITION

Our prior opinion of October 25, 2023 is vacated. The judgment of conviction is affirmed, but the sentence is vacated, and the matter is remanded to the trial court for resentencing in accordance with the views expressed in this opinion.

---

[8] " ' "The proper remedy for this type of failure of proof—where . . . [aggravating facts] were 'never tried' to the jury—is to remand and give the People an opportunity to retry" ' the aggravating facts." (*Lynch*, *supra*, 16 Cal.5th at p. 776, brackets in original.)

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

MILLER, J.

*(People v. Pineda A163880)*

35